The PARKWAY COMPANY, Parkway Company of Texas, Inc. and Sugar Creek Corporation, Petitioners,

v.

Ray WOODRUFF and Constance Woodruff Presley, Mickelson & Klein, Inc., and Vansickle, Mickelson & Klein, Inc., Respondents.

No. D–4185.

Supreme Court of Texas.

Argued Sept. 21, 1994.

Decided June 15, 1995.

Rehearing Overruled July 21, 1995.

---

Randall D. Wilkins, Edward J. Hennessy, Houston, for petitioners.

Amy Dunn Taylor, Linda Foreman Clark, Michael T. Powell, Houston, for respondents.

Justice CORNYN delivered the opinion of the Court, joined by Chief Justice PHILLIPS, Justice GONZALEZ, Justice HIGHTOWER, Justice HECHT, Justice ENOCH, Justice SPECTOR and Justice OWEN.

We decide in this case whether a real estate development company violated the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA), TEX.BUS. & COM.CODE § 17.41–.63, when it sold a vacant lot in a master-planned community and years later negligently caused a home built on that lot to be flooded. The homeowners argue that the developer breached an implied warranty that its future development services would be performed in a good and workmanlike manner and that it acted unconscionably. Because we reject both of these theories of DTPA liability in this case, we reform the judgment of the court of appeals to delete any award of damages based on the DTPA. We also conclude that the homeowners received a double recovery for their property damage, and delete the duplicative part of the award. We affirm the remainder of the judgment for negligence-based damages, which were not challenged by the developer, and for out-of-pocket expenses. Finally, we agree with those parts of the court of appeals' opinion that find no evidence to support the mental anguish damages awarded and that affirm the directed verdict rendered on Parkway's claims against its engineers.

## I. Facts

The Sugar Creek Corporation and its successor-in-interest, the Parkway Company (collectively, Parkway), created a real estate development known as Sugar Creek on the south side of Houston. Parkway prepared the land for homebuilding by platting, surveying, regrading, building roads, and dealing with local regulatory and utility authorities. The Sugar Creek community was developed over a period of years, and included plans for retail and recreational areas.

In 1977 Harrington Homes purchased the lot at issue, in section 24 of the development, and built a house on it. After Harrington Homes sold it to the original occupants, the house was resold and occupied by another homeowner before Ray and Constance Woodruff bought it and moved in during April 1981.

In 1983 Parkway began to develop Sugar Creek section 34, which lies immediately to the east of the Woodruffs' lot and the Kaneb tract, a large commercial tract that lies to the north of the Woodruffs' lot and the rest of section 24. During the course of its work in early 1983, Parkway began constructing a wall along the line dividing section 34 from the Kaneb tract and section 24.

```
Kaneb Tract
                    S                                         S
                        W      Section 34                     T
                                                              R
------------------------------- A                            E
                               |        L                     E
      Section 24     Wood-     |              E               T
                     ruff      |
                     Lot       |
                               |
                    .          |
------------------------------------------------------------
          S T R E E T
------------------------------------------------------------
```

Ray Woodruff, who holds an engineering degree, advised Parkway by letter on February 3, 1983, that the wall might alter drainage patterns on his lot. Six days later, during a heavy rainstorm, the Woodruffs observed that regrading activities on section 34 had diverted runoff from the Kaneb tract onto their land.

After investigation, Parkway's engineers proposed a new drainage system, but Mr. Woodruff objected to the proposal because it called for the construction of an earthen berm across the back of his lot. Instead Woodruff installed another type of drainage system. Parkway offered to pay for Mr. Woodruff's drainage system on the condition that the Woodruffs release Parkway from any future liability. The Woodruffs objected to the release, however, and covered the construction costs themselves. Parkway finished the wall in July 1983.

When Hurricane Alicia struck the Texas coast on August 18, 1983, run-off from the Kaneb tract flooded the Woodruffs' sun room. The house flooded again in 1986, 1987, and 1989. As a result, the house suffered a cracked foundation and other structural damage.

The Woodruffs filed suit in 1984 for negligence, gross negligence, nuisance, trespass, and Water Code violations. They also alleged that Parkway was liable under the DTPA for: (1) unconscionable conduct; (2) false, misleading, or deceptive acts or practices; and (3) the knowing breach of an implied warranty to perform "development services" in "a good and workmanlike manner." Parkway, in turn, filed third-party claims against its engineers, the owners of the Kaneb tract, and Harrington Homes. The Woodruffs later amended their petition to sue directly these additional parties.

At trial, the district court granted a directed verdict in favor of Harrington Homes and Parkway's engineers. On the remaining claims, a jury found that Parkway was negligent but that the owners of the Kaneb tract were not. The jury also found that Parkway violated the Water Code, that it knowingly breached an implied warranty, and that it acted unconscionably. The jury declined, however, to find that Parkway was grossly negligent, that it engaged in any false, misleading, or deceptive acts or practices, or that it intentionally caused a trespass of the Woodruffs' property. The court rendered

judgment for actual damages of $220,000, including $120,000 for diminution in value and $100,000 for repairs to the Woodruffs' house. Based on the DTPA findings, the trial court also rendered judgment for the Woodruffs for "additional" damages, a percentage-based award of attorney's fees, and mental anguish damages.

The court of appeals affirmed most of the trial court's judgment, but deleted any damages for mental anguish, and added $14,000 in out-of-pocket expenses claimed by the Woodruffs. 857 S.W.2d 903.

## II. DTPA Violations

The Woodruffs allege that Parkway violated the DTPA by breaching an implied warranty to perform future development services in a good and workmanlike manner, or alternatively, by committing an unconscionable act. Assuming that the Woodruffs are consumers under the DTPA,[1] we analyze each basis for DTPA recovery.

### A. Implied Warranty

■■■■ The DTPA prohibits the breach of an express or implied warranty, see Tex.Bus. & Com.Code § 17.50(a)(2), but it does not create warranties. The warranties, both express and implied, actionable under the DTPA must be recognized by the common law or created by statute. See La Sara Grain Co. v. First Nat'l Bank, 673 S.W.2d 558, 565 (Tex.1984). Unlike the implied warranties imposed on certain sales transactions

under the Uniform Commercial Code,[2] the implied service warranty is a common law creation. See Melody Home Mfg. Co. v. Barnes, 741 S.W.2d 349, 353 (Tex.1987) ("An implied warranty arises by operation of law when public policy so mandates."). Before it was adopted by the court of appeals, the implied warranty to perform future development services was unknown to Texas jurisprudence. The question presented for our decision, then, is whether such an implied warranty[3] should be recognized under the facts of this case.

The judicial recognition of implied warranties in service transactions in Texas has had a short and somewhat uneven history.[4] Until 1987 this Court had never recognized a cause of action for breach of an implied warranty relating to services. In Dennis v. Allison, 698 S.W.2d 94 (Tex.1985), we declined to recognize an implied warranty in connection with medical services when a patient was sexually assaulted and beaten by her psychiatrist. The Court considered whether judicial recognition of an implied warranty was justified in light of existing remedies available to the patient. In denying recovery under an implied warranty theory, the Court concluded: "It is not necessary to impose an implied warranty theory as a matter of public policy because the plaintiff patient has adequate remedies to redress wrongs committed during treatment." Id. at 96.

---

1. Parkway argues that the Woodruffs are not consumers under the DTPA. See generally Tex. Bus. & Com.Code § 17.45(4) (defining "consumer"); see also Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 539 (Tex.1981) (summarizing judicial interpretations of this definition). Because we conclude that Parkway did not violate the DTPA, we do not address the issue of consumer status. See Delaney Realty, Inc. v. Ozuna, 593 S.W.2d 797 (Tex.Civ.App.—El Paso), writ ref'd n.r.e. per curiam, 600 S.W.2d 780, 782 (Tex. 1980).

2. Chapter 2 of the Texas Business and Commerce Code establishes three implied warranties in sales transactions: (1) the warranty of title, Tex.Bus. & Com.Code, § 2.312; (2) the warranty of merchantability, Tex.Bus. & Com.Code, § 2.314; and (3) the warranty of fitness for a particular purpose, Tex.Bus. & Com.Code § 2.315. None of

these warranties applies to a strictly service transaction.

3. "Warranty" was defined in the charge as an implied promise that services sold or offered for sale by Sugar Creek to the Woodruffs would be performed in a good and workmanlike manner.

4. Traditionally, commentators rejected the idea that warranties applied to services at all. See, e.g., BARKLEY CLARK & CHRISTOPHER SMITH, THE LAW OF PRODUCT WARRANTIES at 2–16 (1984) (characterizing the implied warranty of workmanlike performance as "merely another label for negligence"). The advent of enhanced remedies in consumer protection statutes like the DTPA has provided an incentive to characterize what have previously been regarded as simple negligence actions into breach of implied warranty claims actionable under the DTPA.

Two years later, in *Melody Home,* this Court first recognized a limited implied warranty relating to services. Without retreating from its holding in *Dennis v. Allison,* the Court recognized "an implied warranty to repair or modify existing tangible goods or property in a good and workmanlike manner." 741 S.W.2d at 354.

At least two principles from *Dennis* and *Melody Home* apply in this case. First, an implied warranty will not be judicially imposed unless there is a demonstrated need for it. Second, the *Melody Home* implied warranty extends only to services provided to remedy defects existing at the time of the relevant consumer transaction.[5]

■ These preliminary issues aside, we view the issue presented here to be whether consumers who are injured by substandard services can recover under an implied warranty theory when they neither sought nor acquired the services about which they complain. The requirement that a consumer urging an implied warranty for services seek or acquire that specific service flows from the historical definition of a warranty:

> A warranty is an express or implied statement of something *with respect to the article sold,* which the seller undertakes shall be part of a contract of sale; and though part of the contract, yet collateral to the express object of it.

ARTHUR BIDDLE, A TREATISE ON THE LAW OF WARRANTIES IN THE SALE OF CHATTELS 1 (Philadelphia, Kay & Brother 1884) (emphasis added).[6] Therefore, to determine whether an implied warranty to provide future development services should be extended to the Woodruffs, we must first identify an underlying transaction upon which an implied warranty might be imposed. The parties identify three possible underlying transactions: the sale of the lot from Parkway to the homebuilder, the purchase of the home by the Woodruffs, and the regrading and drainage work performed by Parkway in 1983.

Of these three options, we find the last one the least persuasive. In the 1983 negotiations, no contract was formed, and no goods or services were sold. The second alternative, the Woodruffs' purchase of the home in 1981, is also problematic. Parkway was not involved at all in this transaction and did not sell any goods or offer or agree to perform any particular services in connection with the sale. That leaves the initial sale of the lot by Parkway to the homebuilder as the only remaining transaction upon which a service-related implied warranty could be imposed. The Woodruffs' claim hinges on whether any services were conveyed or promised as a part of this transaction. The sale clearly conveyed goods,[7] but our focus is on whether the sale had a service element as well.

We find no reasonable basis under these facts for concluding that Parkway impliedly agreed to perform future development services for the Woodruffs' benefit. The court of appeals pointed to Parkway's claim that Sugar Creek was a "master planned community" as evidence of an implied promise to provide these services. The court reasoned that this term

> certainly suggests to a potential purchaser that each aspect of the development would be undertaken with concern for the rest of the development, that the subdivision would not be built piecemeal, and that the construction of one section would not, as happened here, be allowed to adversely affect another section. The concept of "master planning" also implies provision of continued competent development including flood control, drainage, management, and maintenance services.

857 S.W.2d at 911.

In reaching this conclusion, the court of appeals equated the use of the term "master

---

5. In *Archibald v. Act III Arabians,* 755 S.W.2d 84, 85 (Tex.1988), the Court considered whether "horse training services fall within the scope of the implied warranty enunciated in *Melody Home."* A divided court answered that question in the affirmative, characterizing horse training as the modification of an existing tangible good, and viewing the case as fitting squarely within its decision in *Melody Home. Id.* at 86.

6. Biddle wrote his treatise before service-related warranties were recognized, but the same reasoning applies to them.

7. The DTPA includes land in its definition of goods. *See* TEX.BUS. & COM.CODE § 17.45(1).

planned community" with an implied promise to never "adversely affect" any homeowner in the community. We do not believe that these terms should be given such an expansive meaning. "Master planned community" and "planned community" are terms of art, specifying a particular form of common ownership.[8] In the Sugar Creek development, Parkway established a homeowners' association to maintain common area improvements, imposed similar deed restrictions on all homes within the development, and created the formal development plan required for a planned unit development. These features distinguished Sugar Creek as a "planned community," as the term is used in the real estate industry. Parkway's use of the term to describe its development can be fairly construed as a representation about the form of common interest ownership, not an implied promise to provide future development services of the type at issue here.

The only other evidence relied on by the Woodruffs to support their implied warranty claim is a scale model of the development displayed in Parkway's information center. We recognize that models can create *express* warranties about the qualities of goods sold: when a model is displayed prior to sale, the *goods delivered must conform to the model.* TEX.BUS. & COM.CODE § 2.313(a)(3). But the Woodruffs' argument confuses a statutorily created *express* warranty with a judicially-created *implied* warranty. The testimony about Parkway's model was to the effect that it was intended to show "where everything was eventually going to be within the community." Neither our past holdings nor sound logic support the conclusion that such a model represents an implied promise to never adversely affect the Woodruffs' property.

Accordingly, we hold that no implied warranty to perform future development services should be imposed in this case. Because no services were included in the transaction, no

service-related warranty was breached. Moreover, the Woodruffs have not met their burden under *Dennis v. Allison* to show why damages for negligence do not provide an "adequate remed[y] to redress wrongs committed," *see* 698 S.W.2d at 96, and thus have not demonstrated a compelling case for recognition of an implied warranty under these circumstances. To the extent the judgment relied on this breach of warranty theory, it cannot stand.

### B. Unconscionability

■ The Woodruffs also contend that Parkway violated the DTPA by acting unconscionably. The DTPA defines an "unconscionable action or course of action" as one which:

A.  takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

B.  results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

TEX.BUS. & COM.CODE § 17.45(5). The Woodruffs did not specify whether they sought to show unconscionability under Part A or B of this definition, and both parts were included in the jury charge. Although the jury found that Parkway committed an unconscionable act, the court of appeals did not address unconscionability because it affirmed the trial court's DTPA judgment on the theory of implied warranty, which we have rejected. Because unconscionability is an alternative theory of DTPA liability upon which the court of appeals judgment might be affirmed, we must address it. Parkway challenges the legal sufficiency of the evidence under both definitions.

■ Under Part A, the Woodruffs argue that Parkway's exclusive control over the

---

8.  Master planned communities are typically residential developments zoned as planned unit developments with a homeowners' association to maintain common area improvements and to enforce other covenants and restrictions after the initial development stage. *See* Wayne S. Hyatt & Jo Anne P. Stubblefield, *The Identity Crisis of Community Associations: In Search of the Appro-*

priate Analogy, 27 REAL PROP.PROB. & TRUST J. 589, 641–45 (1993). The owners of the individual units hold title to the unit, but the association holds title to the common amenities. *See* UNIF.COMMON INTEREST OWNERSHIP ACT, prefatory note, 7 U.L.A. 231 (1982). Membership in the association is mandatory for all owners of individual units. *Id.*

drainage on the adjacent lots deprived them of the "ability or capacity" to protect their own interests. The Woodruffs overlook the fact that unconscionability requires that the seller take advantage of special skills and training *at the time of the sale. See Chastain v. Koonce*, 700 S.W.2d 579, 584 (Tex. 1985) (rejecting allegations of unfairness based on events occurring one year after the sale). The Woodruffs advance no theory as to how this advantage was exploited at the time of the sale of the property from Parkway to the homebuilder, and there is no evidence that would support such a finding.

■ Under Part B, the Woodruffs argue that the flooding created a gross disparity between the value of their home and what they paid for it. Again, the time for evaluating the disparity in value is the time of sale. Diminution in value caused by later events cannot support a claim of unconscionability. As there is no evidence that Parkway did anything to cause a gross disparity in value at the time of sale, the Woodruffs' claim under this definition of unconscionability also fails.

### C.

Because we conclude that the Woodruffs cannot recover under the DTPA, we reform the judgment to delete any remedy predicated on the DTPA. This includes the discretionary award of damages for a knowing violation of the DTPA and the award of attorney's fees. In the absence of recovery under the DTPA, there is no basis for the recovery of attorney's fees in this case.[9] *See First City Bank v. Guex*, 677 S.W.2d 25, 30 (Tex.1984).

### III. Double Recovery

■ Parkway also alleges that the judgment gives the Woodruffs a double recovery for the damages to their home. Parkway claims that the court of appeals erred by allowing an award of both the cost of repairs *and* the diminution in the value of the home, because the diminution was calculated as-

suming that no repairs had been made. We agree.

■ Texas law does not permit double recovery. *Southern Co. Mut. Ins. Co. v. First Bank & Trust*, 750 S.W.2d 170, 173–74 (Tex.1988). When the prevailing party fails to elect between alternative measures of damages, the court should render the judgment affording the greatest recovery. *See, e.g., Kish v. Van Note*, 692 S.W.2d 463, 468 (Tex.1985) (rendering judgment for each separate element of damages in order to give the plaintiffs complete compensation for their losses).

■ Damages for diminution in value and damages for cost of repairs are not always duplicative. Diminution in value does not duplicate the cost of repairs if the diminution is calculated based on a comparison of the original value of the property and the value *after repairs are made. See Ludt v. McCollum*, 762 S.W.2d 575, 576 (Tex.1988). As the court of appeals recounted, however, the Woodruffs' appraiser calculated the diminution in value by comparing the original value of the house to the value of the *unrepaired* house:

> The Woodruffs' expert appraiser testified that he had done two appraisals of market value as of September 19, 1983, *one assuming the flooding, and attendant damages of a cracked slab, had occurred* and one assuming it had not. The house was worth $240,000 before it flooded and *without being subject to flooding. After it flooded and with the damages cause[d] by the flooding,* it was worth $120,000.

857 S.W.2d at 913 (emphasis added). The Woodruffs also sought, and the jury awarded, $100,000 for the cost to repair the slab of the house. The Woodruffs were required to choose between the diminution in market value of the house *and* the cost of repair; they cannot recover both. Accordingly, we reduce the judgment for actual damages by $100,000.

---

**9.** Although the Woodruffs have established their entitlement to actual damages under theories of negligence and Water Code violations, neither of these theories confers a right to recover attorney's fees.

## IV. Mental Anguish

The Woodruffs challenge the court of appeals' deletion of their award for mental anguish based on legal insufficiency. The court of appeals concluded that "the evidence simply does not demonstrate mental anguish as that term is defined by law." 857 S.W.2d at 916. We agree with the court of appeals.

At the outset, we emphasize the limited nature of our present inquiry: we are focusing only on the type of evidence required to support an award of mental anguish damages in cases in which recovery is allowed. Nonetheless, we find it helpful to begin with a historical overview of mental anguish damages before addressing the legal sufficiency of the Woodruffs' evidence of their mental anguish.

The history of mental anguish damages in Anglo–American jurisprudence is convoluted and complex. Mental anguish claims have long been distrusted by the common law, and an early general rule developed that mental anguish damages were not recoverable. *See Lynch v. Knight,* 11 Eng.Rep. 854, 863 (H.L. 1961). The inherently subjective nature of mental anguish and the concomitant potential for false claims were two of the most commonly cited reasons for skepticism about such claims. *See, e.g., Battalla v. State,* 10 N.Y.2d 237, 219 N.Y.S.2d 34, 37–39, 176 N.E.2d 729, 731–32 (1961); *Knaub v. Gotwalt,* 422 Pa. 267, 220 A.2d 646, 647 (1966). Exceptions to the general rule gradually emerged, falling into roughly two categories. Recovery for mental anguish was permitted when the mental suffering was: (1) accompanied by a physical injury resulting from a physical impact, or (2) produced by a particularly upsetting or disturbing event.

Once the threshold requirements of physical injury and impact or of particularly disturbing events were met, recovery of mental anguish damages was not hard to justify. Mental suffering could be inferred from the fact of physical injury. The Missouri Supreme Court, for example, justified this inference by reasoning that "the mind is as much a part of the body as the bones and muscles, and an injury to the body included the whole, and its effects were not separable." *Connell v. Western Union Tel. Co.,* 116 Mo. 34, 22 S.W. 345, 349 (1893).

Similarly, once particularly disturbing events were proved by reference to objective phenomena or conditions, the law generally allowed the claimant's mental suffering to be presumed to flow from such events. *See* Nancy Levit, *Ethereal Torts,* 61 GEO. WASH.L.REV. 136, 142 (1992) (noting that recovery for mental anguish "depended on proof of an independent tort"). The oldest examples of this category of cases are those involving assault, slander, and other intentional torts. *See, e.g., I. de S. v. W. de S.,* Y.B. 22 Edw. III, fo. 99, pl. 60 (1348) (allowing tavern-keeper to recover when the defendant threw a hatchet at the tavern-keeper's wife).

Although limiting mental anguish damages to cases with either physical impact or disturbing events avoided many evidentiary problems, the limitations were admittedly arbitrary: some claimants with relatively minor mental anguish recovered, while others who might have suffered significant anguish were precluded from any recovery. As a result, many of these limitations were first relaxed and later abandoned. The requirement of a physical impact was relaxed, and recovery for mental anguish was permitted so long as the anguish manifested itself physically. *See* James G. Curenton, *The Twilight Zone of Danger: Negligent Infliction of Emotional Distress as an Actionable Tort,* 15 CUMB.L.REV. 519, 522 n. 23 (1985) (listing 39 jurisdictions that abandoned the physical impact rule between 1890 and 1983). *But see Consolidated Rail Corp. v. Gottshall,* —— U.S. ——, ——, 114 S.Ct. 2396, 2406, 129 L.Ed.2d 427 (1994) (noting that at least five states continue to adhere to the physical impact test). Abandonment of the physical impact requirement led the way to recovery for mental injuries suffered by bystanders in the "zone of danger," *see id.* (noting that 14 states have expanded recovery for mental anguish to this point and no further); and even to specified parties beyond this zone. *See, e.g., Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 80, 441 P.2d 912, 920 (1968) (allowing recovery for mental anguish by a witness to the injury of a close relative). In

recent years, several states have eliminated the physical manifestation requirement altogether. *See, e.g., Schultz v. Barberton Glass Co.,* 4 Ohio St.3d 131, 447 N.E.2d 109, 112 (1983); *Johnson v. Ruark Obstetrics & Gyn. Assocs.,* 327 N.C. 283, 395 S.E.2d 85, 97 (1990).

Over time, the disturbing events exception also yielded to pressure to provide compensation in more routine cases. Courts took cognizance of mental anguish injuries not only in cases of malicious intentional wrongs, but also in cases involving violations of statutes. *See, e.g., Johnson v. Alaska State Dep't of Fish & Game,* 836 P.2d 896, 915 (Alaska 1991) (allowing recovery of mental anguish damages caused by violation of a discrimination statute). *But cf. Gallagher v. Bituminous Fire & Marine Ins. Co.,* 303 Md. 201, 492 A.2d 1280, 1284 (1985) (refusing to permit recovery of mental anguish damages caused by the intentional violation of a statute when the statute merely required the payment of money). Some jurisdictions came to recognize a distinct legal duty to avoid even the negligent infliction of emotional harm itself. *See, e.g., Taylor v. Baptist Med. Ctr., Inc.,* 400 So.2d 369 (Ala.1981); *Montinieri v. Southern New Eng. Tel. Co.,* 175 Conn. 337, 398 A.2d 1180 (1978); *Rodrigues v. State,* 52 Haw. 283, 472 P.2d 509 (1970); *Gammon v. Osteopathic Hosp. of Maine, Inc.,* 534 A.2d 1282 (Me.1987); *Johnson v. Supersave Markets, Inc.,* 211 Mont. 465, 686 P.2d 209 (1984); *Bass v. Nooney Co.,* 646 S.W.2d 765 (Mo.1983); *Johnson v. Ruark Obstetrics & Gyn. Assocs.,* 327 N.C. 283, 395 S.E.2d 85 (1990); *Schultz v. Barberton Glass Co.,* 4 Ohio St.3d 131, 447 N.E.2d 109 (1983).

Texas law has generally followed the same ad hoc pattern of development. We initially allowed mental anguish damages only in cases in which there was a physical injury. *See Hill v. Kimball,* 76 Tex. 210, 13 S.W. 59, 59 (1890) ("Probably an action will not lie when there is no injury except the suffering of the fright itself...."). At the turn of the century, we allowed recovery for mental anguish unaccompanied by physical impact injury, provided the mental anguish had a physical manifestation. *See Hill,* 13 S.W. at

59; *Gulf, C. & S.F. Ry. Co. v. Hayter,* 93 Tex. 239, 54 S.W. 944, 945 (1900). We eased the physical impact rule even further when we adopted the bystander rule from *Dillon v. Legg* in *Freeman v. City of Pasadena,* 744 S.W.2d 923, 923–24 (Tex.1988).

Texas courts have also struggled to distinguish between the disturbing events that justify mental anguish damages and those that do not. Unwilling to confine mental anguish damages to intentional torts, our courts have allowed mental anguish damages for such things as failing to deliver a telegraph relating to death or last illness, *see Stuart v. Western Union Tel. Co.,* 66 Tex. 580, 18 S.W. 351, 353 (1885); sending a passenger to the wrong destination, *see Texas & Pac. Ry. Co. v. Armstrong,* 93 Tex. 31, 51 S.W. 835, 836 (1899); and mishandling a corpse. *See Pat H. Foley & Co. v. Wyatt,* 442 S.W.2d 904, 907 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.).

The physical manifestation requirement was first excused under exceptional circumstances, and then abandoned completely in 1987. *See St. Elizabeth Hosp. v. Garrard,* 730 S.W.2d 649, 654 (Tex.1987), *overruled on other grounds, Boyles v. Kerr,* 855 S.W.2d 593 (Tex.1993). Similarly, the types of culpable conduct for which mental anguish damages were allowed expanded to include more commonplace misconduct, such as knowing misrepresentations in a consumer transaction. *See Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115 (Tex.1984).

As mental anguish damages have became more readily available, members of this Court have voiced concerns about the potential for over-compensation and even double recovery. *See Moore v. Lillebo,* 722 S.W.2d 683, 688–692 (Tex.1986) (Spears, J., joined by Gonzalez, J., dissenting) (arguing that elimination of physical manifestation requirement for recovery of mental anguish damages would allow damages for non-compensable sorrow, anger, worry, and fear, and in a wrongful death case, would duplicate those damages already allowed for loss of companionship and society); *see also Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 368–69 (Tex.1987) (disallowing recovery for "shock and emotional trauma" as duplicative

of award for mental anguish). Genuineness of a claim of mental anguish has never been the solitary basis for judicial concerns about this species of recovery. Rather, the variability and thus unpredictability of such awards, due to the broad discretion routinely afforded juries when awarding mental anguish damages, helps to explain some of the artificial constraints historically placed on the recovery of such damages. The early requirements for establishing the recoverability of mental anguish damages served primarily as proxies for direct evidence of mental injury. When, for example, evidence of a physical manifestation of a mental injury was required, evidence tended to be directed at proving the manifestation, rather than proving the amount of actual anguish. Similarly, when recovery of mental anguish damages was limited to cases of especially culpable conduct, the focus of the evidence tended to be on the nature of the malfeasance, rather than on the extent of anguish. *See, e.g., Texas & Pac. Ry. Co. v. Armstrong,* 93 Tex. 31, 51 S.W. 835 (1899) (devoting a significant portion of the opinion to the details of the railroad's mistaken issuance of a ticket to the wrong destination, but only a single sentence to the passenger's reaction).

The erosion of these proxies as a substitute for proof of mental anguish has created a vacuum of sorts, in which the only guidance given by trial courts to juries is a confounding definition of mental anguish, of which the following is typical:

> The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*Trevino v. Southwestern Bell Tel. Co.,* 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ). This definition requires a jury to distinguish between disappointment and severe disappointment, between embarrassment and wounded pride, between anger and indignation. It is little

wonder that courts and juries have found this and similar definitions of mental anguish "somewhat unwieldy." *Sanchez v. Guerrero,* 885 S.W.2d 487, 494 (Tex.Civ.App.—El Paso 1994, no writ).

When a challenge is made to the sufficiency of the evidence to go to the jury or to support the jury's finding, the same type of problem persists. The reviewing court must distinguish between shades and degrees of emotion. These distinctions are critical under our substantive law because evidence of lesser reactions cannot support an award of mental anguish damages.

■ Under this admittedly nebulous definition and the traditional standard of review, it is nevertheless clear that an award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine. Such evidence, whether in the form of the claimants' own testimony, that of third parties, or that of experts, is more likely to provide the fact finder with adequate details to assess mental anguish claims. Although we stop short of requiring this type of evidence in all cases in which mental anguish damages are sought, the absence of this type of evidence, particularly when it can be readily supplied or procured by the plaintiff, justifies close judicial scrutiny of other evidence offered on this element of damages.

■ When claimants fail to present direct evidence of the nature, duration, or severity of their anguish, we apply traditional "no evidence" standards to determine whether the record reveals any evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger" to support any award of damages. *See J.B. Custom Design & Bldg. v. Clawson,* 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ). In applying this standard to the record before us, we conclude that the jurors here were left to speculate about the existence of compensable mental anguish in this case.

Only two passages of the testimony directly addressed the Woodruffs' mental state. Ray Woodruff testified:

I was hot. I was very disturbed about that, and called him and said, "I would like to sell you a house. I think you have just flooded my property, I think you have messed up my house." I begged the guy not to.

Constance Woodruff made the following statements in one passage of her testimony (which is reprinted in full in the court of appeals' opinion):

[I]t's just not pleasant walking around on cement floors.

. . . .

Well, [our life] changed. It just—I don't know, it's a hard feeling to describe, unless you go through it. It was just upsetting, Ray would come home and he would become very quiet. He was—I guess we both were. It caused some friction between us because I wanted to just get it done and get over with and things couldn't move as quickly as I wanted them to.

. . . .

Afraid? I wasn't afraid. I guess I was—I was just upset that it changed our life style. We were all very happy, and since I lived at home quite—well, most of the time, it meant a lot to me. I'm a very private person, and I really maybe depended upon my house a little more than other people.

These statements show that the Woodruffs felt anger, frustration, or vexation, but they do not support the conclusion that these emotions rose to a compensable level. For the most part, the quoted testimony does nothing but cite the existence of "mere emotions": "I was hot," "It was just upsetting," and "I was just upset." It does not support the conclusion that the Woodruffs suffered compensable mental anguish.

Not only is the record devoid of direct evidence of the nature, duration, or severity of the Woodruffs' mental anguish, there is also no circumstantial evidence other than the fact of the flooding itself to support any award of mental anguish. As we have noted, historically, some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish. As a general matter, though, qualifying events have demonstrated a threat to one's physical safety or reputation or involved the death of, or serious injury to, a family member. While the flooding of the Woodruffs' home certainly disrupted their lives temporarily, under our substantive law this type of disruption will not support an inference that compensable mental anguish occurred.[10] Evidence of Parkway's negligence and the resulting property damage cannot alone support the mental anguish damages.

We therefore affirm the court of appeals' holding that the evidence of mental anguish damages was legally insufficient.

### V. Conclusion

The judgment of the court of appeals is hereby modified to delete any recovery under the DTPA, for attorney's fees, and for the double recovery of damages, and as reformed the court of appeals' judgment is affirmed. Regarding Parkway's point of error challenging the directed verdict on its claims against the engineers, we agree with the court of appeals' that there was no expert testimony of the applicable standard of care or any basis for finding a breach of that standard. 857 S.W.2d at 919. Accordingly, we affirm the court of appeals' judgment for the engineers.

Justice GAMMAGE, dissenting.

I dissent to that part of the majority opinion which refuses to recognize an implied

---

10. Although the jurors apparently concluded that the flooding was an event from which mental anguish may be inferred, this conclusion is at odds with the very definition of mental anguish. Homes flood with such frequency—from leaky roofs, clogged toilets, and bursting pipes—that flooding cannot be said to be beyond the vicissitudes of daily life. Had the Woodruffs presented additional evidence, for example, that the flood-

ing jeopardized their personal safety, our conclusion today would likely be different. In the absence of such evidence, the jury's verdict is necessarily based on sympathy or the juror's personal experiences, considerations which are not permitted under Texas law. *See Callejo v. Brazos Elec. Power Co-op.*, 755 S.W.2d 73, 75 (Tex. 1988); *see also* Tex.R.Civ.P. 226a (approved instructions) pt. II, para. 7 & pt. III, para. 1.

warranty cause of action in this case. I agree that the Woodruffs were awarded a double recovery when they received both the cost of repairs and the diminution in value of the home which was calculated assuming no repairs were made. I also agree that the Woodruffs presented insufficient evidence to support an award for mental anguish damages. I do not agree with the majority, however, that the Woodruffs do not have a cause of action under the DTPA.

The majority maintains that the Woodruffs do not have a cause of action under the DTPA based upon either implied warranty or unconscionability theories. I believe the Woodruffs do present facts giving rise to a cause of action for Parkway's breach of an implied service warranty.

As the majority notes, this Court has recognized an implied warranty "to *repair or modify* existing tangible goods or property in a good and workmanlike manner" in *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex.1987) (emphasis added). The court of appeals correctly held that the applicability of an implied warranty is not negated because the Woodruffs did not purchase their home from the builder. An implied warranty of good and workmanlike construction from a builder/vendor extends to the remote purchaser. *Gupta v. Ritter Homes, Inc.*, 646 S.W.2d 168 (Tex.1983); *see also Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 78 (Tex.1977).

The majority concludes, however, that Parkway did not impliedly agree to perform future development services "for the Woodruffs' benefit." But the issue is not whether Parkway agreed to provide development services *for the Woodruffs' benefit;* it is whether Parkway impliedly agreed to conduct its future development in a manner not *detrimental* to the Woodruffs and consistent with the scheme of the master-planned community. When the Woodruffs purchased their house, they contracted not only for a house but also for a master-planned community—a developed neighborhood. They were forced to rely on Parkway for its expertise on the technical aspects of building a housing development, including its skills in providing adequate drainage for all lots, because the Woodruffs lacked the knowledge and ability to do so themselves.

As the court of appeals notes, "a homebuyer/consumer cannot, by reasonable examination, discern or anticipate irresponsible or defective subdivision development activities." 857 S.W.2d 903, 911. It is reasonable for a consumer to expect that when he or she buys into a housing community under development the developer will conduct its future development activities without affirmatively damaging their property. Certainly no reasonable homebuyer would purchase a house with the expectation that the neighborhood's developer would take affirmative action to damage the buyer's property. A developer or builder selling property in a development community may not be impliedly warranting for future development services, but equity demands that he does warrant to not in the future violate the development's master plan in such a way as to interfere with purchasers' reasonably anticipated use and enjoyment of their property.

Service provided in a good and workmanlike manner means "that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Melody Home*, 741 S.W.2d at 354. As this Court pointed out in *Melody Home*, "a service provider is in a much better position to prevent loss than is the consumer of the service.... [A] consumer should be able to rely upon the expertise of the service provider." *Id.* at 353. In this case, Parkway, as the developer, was in the better position to ensure that its construction on lots adjoining the Woodruffs' would not result in property damage to other lots and homes in the area. As a professional developer, Parkway impliedly warranted that it would competently furnish development services. By intentionally flooding developed lots and homes, Parkway breached the implied warranty to repair or modify existing property in a good or workmanlike manner.

I would find Parkway liable under the DTPA for breach of the implied warranty to repair or modify existing property in a good

and workmanlike manner. This cause should be remanded for trial under alternative theories of negligence and DTPA. I respectfully dissent.