**BURLINGTON COAT FACTORY WAREHOUSE OF EL PASO, INC., Appellant,**

**v.**

**George FLORES, Appellee.**

**No. 08–96–00414–CV.**

Court of Appeals of Texas, El Paso.

Aug. 28, 1997.

Cynthia S. Anderson, Kemp, Smith, Duncan & Hammond, P.C., El Paso, for Appellant.

Mark D. Pierce, El Paso, for Appellee.

Before LARSEN, McCLURE and CHEW, JJ.

*OPINION*

LARSEN, Justice.

This is an appeal from a jury verdict in favor of appellee, George Flores. The jury found that Flores' employer, appellant Burlington Coat Factory Warehouse of El Paso, Inc., terminated Flores in violation of the Texas Labor Code. Specifically, Flores alleged that he was terminated and treated discriminatorily in violation of Texas Labor Code Section 451.001 after he filed a workers' compensation claim. The jury agreed and awarded Flores $21,000 in actual damages and, after finding that Burlington acted willfully and maliciously, awarded an additional $200,000 in exemplary damages. Burlington challenges the legal and factual sufficiency of the evidence to support the jury's liability and damages findings. We affirm in part and reverse and render in part.

*DISCUSSION*

Burlington challenges the verdict with five points of error collected for briefing into two groups. Group One includes points contesting the sufficiency of the evidence to support the award of punitive damages. Group Two includes challenges to the sufficiency of the evidence to support liability and actual damages.

**a. Liability**

In its Group Two, Subpoints A and B, Burlington challenges the legal and factual sufficiency of the evidence to support the jury's finding that it terminated Flores in violation of Section 451.001 of the Texas Labor Code.

*1. Applicable Law*

■ The Texas Labor Code, in pertinent part, prohibits an employer from discharging or in any other manner discriminating against an employee because the employee has filed a workers' compensation claim in good faith. TEX.LAB.CODE ANN. § 451.001

(Vernon 1996). In order to succeed on a claimed violation of Section 451, the employee must show that the termination or other discrimination would not have occurred when it did but for the employee's assertion of a compensation claim. *Continental Coffee Products, Co. v. Cazarez,* 937 S.W.2d 444, 450, 451 (Tex.1996).

*2. Standard of Review*

In considering a legal sufficiency or "no evidence" point, an appellate court considers only the evidence which tends to support the jury's findings and disregards all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Worsham Steel Co. v. Arias,* 831 S.W.2d 81, 83 (Tex.App.—El Paso 1992, no writ). If any probative evidence supports the jury's determination, it must be upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *Neily v. Aaron,* 724 S.W.2d 908, 913 (Tex.App.—Fort Worth 1987, no writ); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence",* 69 TEX.L.REV. 515 (1991).

A factual sufficiency point requires examination of all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 244 S.W.2d at 660; *Worsham Steel Co.,* 831 S.W.2d at 81. The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force to support the finding, it must be sustained. *Carrasco v. Goatcher,* 623 S.W.2d 769, 772 (Tex.App.—El Paso 1981, no writ). It is not within the province of this court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796–97 (1951); *Reynolds v. Kessler,* 669 S.W.2d 801, 807 (Tex.App.—El Paso 1984, no writ). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Clark v. Nat'l Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820, 821 (1947); *Oechsner v. Ameritrust Texas, N.A.,*

840 S.W.2d 131, 136 (Tex.App.—El Paso 1992, writ denied).

### 3. Summary of the Evidence

■ When Burlington hired Flores on July 13, 1993, it operated three facilities in the El Paso, Texas area: a retail store in El Paso; a retail store in Juarez, Mexico; and a distribution center/warehouse located in El Paso serving the two retail stores. Burlington initially hired Flores as receiving manager for the Juarez retail store. The Mexican government's limitations on the number of United States citizens allowed to work in Mexico, however, caused the company to change Flores' assignment to assistant to Loretta Alday, the distribution center manager at the El Paso warehouse.

On February 17, 1994, Flores hurt his left wrist while working. Alday sent Flores to Doctor's Inn for immediate treatment. The treating physician at Doctor's Inn initially released Flores for light duty work, but after a follow-up visit a few days later, another physician at Doctor's Inn took Flores off work completely. Flores stayed home for about two weeks until Alday called him and ordered him to return to work. According to Flores, when he protested that he did not have a doctor's release, Alday told him not to worry, that she was "going to take care of it." Alday's statements gave Flores the "impression" that she had the power to force the doctor to release him to work. Martin Contreras, a former Burlington shipping supervisor, testified that he asked Alday how she expected Flores to come back to work if he were still injured. Alday allegedly replied "Well, if they don't work, I'll just dismiss them," referring to Flores and another employee out on workers' compensation at the same time. Flores claimed that he went back to work and worked at the warehouse for three weeks without a work release until he reinjured his wrist in April. The record, however, reflects a light duty release for Flores dated March 3, 1994. Alday denied telling Flores that she could get the doctor to release him to work, and denied making any contact with his doctor. Both Alday and Lori Stevenson, the claims adjuster for Burlington's workers' compensation carrier assigned to Flores' case, testified that Stevenson called Flores' doctor to inquire whether Flores could do light duty work. When the doctor confirmed Flores' ability to work under certain restrictions, Stevenson called Alday and informed her of Flores' status. Alday testified that she assigned Flores to a light duty job in "debits and charge backs." According to Alday, the assignment required Flores to count and log damaged, torn, or broken merchandise. He was expected to place the merchandise in bins, but he was not expected to lift or carry the bins. Flores, on the other hand, recounted that Alday assigned him to regular duty work, which included lifting boxes weighing up to 70 pounds, during the three weeks he worked before reinjuring himself.

After Flores reinjured his wrist in April 1994, he treated with Dr. A. Hernandez, who kept Flores off work from April 12 through August 3, 1994. Flores' wife, Marcela Flores, testified that during this time, Alday called the Flores home. When Marcela Flores told Alday that Flores was not in, Alday started "screaming" at her, and told her that Flores should be by the phone waiting for her "whatever time she called." Flores testified that Alday contacted him in August and told him that he needed to come back to work. Flores claimed that he again protested he did not have a work release, and Alday again told him that she or Stevenson could get the doctor to release him. The record contains a light duty work release for Flores effective August 8, 1994. Alday denied any attempt to get Flores' doctor to release him to work, and also denied telling Flores that she could do so.

During Flores' second period of absence from work, Burlington had a major layoff in the warehouse, reducing warehouse personnel to a "skeleton crew." According to Burlington witnesses, the Mexican government's devaluation of the peso in 1994 caused economic difficulties in Mexico and rendered the Juarez store incapable of sustaining its share of the warehouse payroll. Since the status of the warehouse no longer provided for light duty work, Alday contacted Shirley Razo, manager of merchandising at the El Paso retail store, to find a position for Flores. Razo created a light duty job for Flores as

the men's dressing room attendant. No one had filled the position before Flores, and no one filled it after Flores was assigned other duties. Flores' duties included handing out tickets showing the number of items a customer took into the dressing room and reracking clothing after the customer tried it on. Flores testified that he did not consider the job light duty because it required "getting all the clothes out of the fitting rooms, we're talking about the whole rack and I had to grab the whole rack and set it and go and place it." During the months of September and October, Flores complained that he was unable to do the work because of his wrist injury.

Flores was next assigned to watch over an open display of watches the store set up for the Christmas season. Richard Molinar, the store's operations manager, oversaw Flores in this capacity as part of the loss prevention department. After Christmas, the hours available to Molinar for operations personnel, including loss prevention personnel, were severely cut back. Molinar testified that although workers are always added prior to, and let go after the Christmas season, the 1994 Christmas season did not bring the expected seasonal revenue increase and the El Paso store had to lay off more workers than usual. Molinar, along with the store manager, William Lemoine, decided that all full-time employees should retain their jobs, and if any hours were left over, part-time workers would be assigned. No hours were left over, however, after full-time workers were accommodated. Although it is undisputed that Flores was a full-time employee at the warehouse prior to his injury, Molinar considered Flores a part-time employee at the store and in the loss prevention department. Accordingly, Flores was laid off on December 29, 1994 along with more than twenty other workers classified as part time. Perhaps coincidentally, Flores' workers' compensation claim had been finally settled only five days before. Molinar recommended Flores for reemployment, but additional hours did not become available.

### 4. Application of the Law to the Facts

Flores presented evidence that he consistently worked at the store more than 35 hours per week, which Burlington normally considered full time. He emphasizes that he was always a full-time employee at the warehouse. Flores charges that Burlington's explanation for his termination as part of the post-Christmas release of all part timers is invalid. Burlington witnesses, however, explained that Burlington considers an employee part time not only if the employee works less than 35 hours per week, but also if the employee is temporary or seasonal. Molinar considered Flores a part timer partially because Flores was a temporary *store* employee "on loan" from the warehouse, and partially because Flores was a seasonal *store* employee watching open displays that were returned to locked cabinets after Christmas. Molinar's explanation is supported by evidence that the El Paso retail store and the warehouse were separate entities under the Burlington umbrella. The store and the warehouse had different store numbers assigned by Burlington, no one from the warehouse reported to anyone at the store and vice versa. Moreover, Molinar testified that he took Flores' wrist condition into account when he made his decision to release him along with the other part timers. Since there was no light duty work at the warehouse, Molinar did not have the option of returning Flores to his full-time duties at the warehouse after the need for temporary and seasonal employees at the store vanished with the Christmas season.

There was also evidence, however, that Flores' employer was neither the "store" nor the "warehouse" but the corporation, Burlington Coat Factory Warehouse of El Paso, Inc., which included both the store and the warehouse. Flores was a full-time employee of Burlington Coat Factory Warehouse of El Paso, Inc. when he was first injured on the job. Additionally, there is some evidence in the record that Flores had been released to regular duty as of October 3, 1994 and therefore could have been returned to the warehouse after Christmas, rather than laid off. Molinar testified that he was unaware of Flores' full duty release when he made his decision to let Flores go with the rest of the part-time workers.

The evidence is not overwhelming in support of either side of this story. In light of the conflicting evidence, the jury was entitled to conclude that Burlington's distinction between Flores as a part-time store employee and Flores as a full-time warehouse employee was artificial and unpersuasive. Burlington offers no explanation for Flores' termination other than that all part-time employees were laid off from the store after the 1994 Christmas season. We therefore find that there was sufficient evidence, under both a legal and factual analysis, to show that Burlington's "part timer" criterion for laying off employees after the 1994 Christmas season did not fit Flores. Accordingly, we find some evidence that Burlington's explanation for terminating Flores was unfounded. From this evidence of Alday's negative attitude toward workers' compensation claims in general and her treatment of Flores in particular, evidence that Flores was given regular rather than light duty upon his return to work after the first injury, and the evidence that Flores was terminated a few days after his workers' compensation claim had been settled, the jury could reasonably infer that Flores was terminated or discriminated against in violation of Section 451.001. *See Continental Coffee*, 937 S.W.2d at 452 (some evidence that employer's only explanation for termination was false and that supervisor expressed doubt that employee had seen doctor sufficient evidence for district court to infer employee was terminated in violation of Section 451.001). We overrule Burlington's Group Two Subpoints A and B.

b. Actual Damages

In Group Two, Subpoint C, Burlington challenges the legal and factual sufficiency of the evidence to support the jury's damage awards for past and future lost wages and mental anguish.

*1. Past Lost Wages*

 The jury awarded Flores $6,000 in past lost wages. The correct measure of damages for past lost wages is the amount of money the employee would have earned had he or she not been terminated, less the sum he or she did earn after termination. *See Southwest Airlines Co. v. Jaeger*, 867 S.W.2d

824, 835 (Tex.App.—El Paso 1993, writ denied); *Canutillo Indep. Sch. Dist. v. Olivares*, 917 S.W.2d 494, 500 (Tex.App.—El Paso 1996, no writ). After his termination from Burlington on December 29, 1994, Flores was out of work for approximately four months. Beginning April 25, 1995, Flores worked at jobs paying minimum wage, or $4.25 per hour, until February 1996, when he obtained the job he held at the time of trial earning $5.45 per hour. Flores had earned $5.85 per hour at Burlington, where he worked 35 to 40 hours per week. Using the more conservative 35 hour per week figure, Flores would have earned about $3,480 in the approximately seventeen weeks he was out of work. The difference between his pay at Burlington and his pay at the minimum wage jobs (again using a 35-hour week for Burlington and a 40-hour week at the minimum wage jobs) for the approximately nine months he worked them is about $1,355. Using the 35-hour figure for his Burlington wages, Flores earned approximately $4,835 less than he would have earned at Burlington from December 29, 1994 through the beginning of February 1996 when he started the job he held at the time of trial. The jury, of course, was entitled to use more than 35 hours per week in its calculation of Flores' Burlington wages since the evidence supports a finding that Flores usually worked more than 35 hours. Accordingly, the jury may have calculated slightly higher figures.

Flores earned $5.45 per hour from February 1996 until June 11, 1996, the date of trial. Even though this wage is forty cents per hour lower than his Burlington wage, it actually represents an increase in weekly wages over Flores' Burlington weekly wage if he works 40 hours per week at his current employment as compared to the 35-hour Burlington minimum we have used for our rough calculations. Since the evidence would support the jury's use of more than 35 hours in its calculation of the Burlington wages, however, the jury was entitled to determine that Flores' weekly wage is now $16 lower than it was for a 40-hour week at Burlington. This would add a few hundred dollars to the calculation of past lost wages. Accordingly, we find the evidence sufficient to support the

jury's finding that Flores lost $6,000 in wages to the time of trial.

### 2. Future Lost Wages

■ The jury awarded Flores $5,000 in future lost wages. Flores testified that at the time of trial, he had obtained a permanent position with the Ysleta School District paying $5.45 per hour, or forty cents per hour less than he made at Burlington. From this evidence, it was within the realm of reasonable probability for the jury to conclude Flores would lose $5,000 in the future resulting from his termination at Burlington.

### 3. Mental Anguish

■ The jury awarded Flores $10,000 in mental anguish damages. Mental anguish damages cannot be awarded without either "direct evidence of the nature, duration, and severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine," or other evidence of "a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex. 1996). While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. *Id.* Compensation can only be for mental anguish that causes "substantial disruption in ... daily routine" or "a high degree of mental pain and distress." *Parkway,* 901 S.W.2d at 444.

■ In this case, Flores testified to "despair" over his termination. Mental anguish includes a mental sensation of pain resulting from "such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, *despai*r or public humiliation or a combination of any of these." *Wal–Mart Stores, Inc. v. Odem,* 929 S.W.2d 513, 528

(Tex.App.—San Antonio 1996, writ denied), *citing GAB Business Servs., Inc. v. Moore,* 829 S.W.2d 345, 350 (Tex.App.—Texarkana 1992, no writ)[emphasis added]. Further, both Flores and his wife, Marcela, testified that the termination caused them to split up for a short time. Flores' children went into, and remain in, counseling. Evidence of his marital break up, brief though it was, and of the necessity of placing his children in counseling is sufficient to show a substantial disruption in Flores' daily routine over and above mere worry, anxiety, vexation, embarrassment, or anger. Although there does not appear to be any evidence of the duration of his "despair," Flores requested only past mental anguish. We find that the jury's award of $10,000 for "despair" and family disruption, even if it existed only during the four months Flores was out of work, is not unreasonable.

### 4. Conclusion

We find the evidence sufficient, both legally and factually to support the jury's damage awards. Accordingly, we overrule Burlington's Group Two Subpoint C.

### c. Punitive Damages

■ In its Group One Points, Subpoint A, Burlington contests the legal and factual sufficiency of the evidence to support the jury's finding that Burlington is liable for punitive damages based on willful and malicious conduct. The Texas Supreme Court has determined that the plaintiff must show actual malice to recover punitive damages in a Section 451 retaliatory termination case. *Continental Coffee,* 937 S.W.2d at 454. Actual malice is defined as "ill-will, spite, evil motive, or purposing the injuring of another." *Id.* at 452, *citing Clements v. Withers,* 437 S.W.2d 818, 822 (Tex.1969). The Supreme Court noted that

[T]he fact that an act is unlawful is not of itself ground for an award of exemplary or punitive damages. The act complained of not only must be unlawful but also must partake of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature, and an act will not be deemed malicious, and so warrant-

ing punitive damages, merely because it is unlawful or wrongful.

*Continental Coffee,* 937 S.W.2d at 454 (citations omitted). The court explained that by requiring evidence of ill-will, spite, or a specific intent to cause injury to the employee, courts will ensure that only egregious violations of the statute will be subject to punitive awards. *Id.*

■ We have reviewed the record carefully in this case, and recounted the evidence in substantial detail above. We find no evidence of ill-will, spite, or specific intent to cause injury to Flores. None of the evidence which establishes the violation of Section 451 suggests the type of egregious violation for which punitive damages are appropriate. Much of the evidence mitigates against a finding of actual malice. It was undisputed that Burlington twice accommodated Flores in light duty jobs, once creating a position that had not previously existed. Flores was recommended for rehiring in the event a job became available. Finding no evidence in the record to support the jury's finding of willful, malicious conduct connected with Flores' termination, we sustain Burlington's Group One, Subpoint A.

### CONCLUSION

Having considered and overruled each of Burlington's Group Two Points, we affirm that part of the judgment finding Burlington liable for, and awarding, actual damages. Having considered and sustained Burlington's Group One, Subpoint A, we reverse that portion of the judgment finding Burlington responsible for willful and malicious conduct and render a take nothing judgment on punitive damages. Our disposition of Group One, Subpoint A makes it unnecessary for us to reach Group One, Subpoint B.

We affirm that part of the judgment awarding actual damages. We reverse that part of the judgment awarding punitive damages, and reform accordingly.