Opinion issued November 1, 2007
 





    






In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-05-00218-CV
____________

WASIM AHMED SHEIKH, Appellant

V.

SHAMA SHEIKH, Appellee




On Appeal from 311th District Court
Harris County, Texas
Trial Court Cause No. 2004-02532



 
MEMORANDUM OPINION
          Appellant, Wasim Ahmed Sheikh, appeals from a decree of divorce dissolving
the marriage between himself and appellee, Shama Sheikh. That decree divided the
parties’ property, made an owelty award to Shama, and also awarded Shama $330,000
in separate tort damages for assault and fraud on her person by Wasim. We determine
whether the trial court abused its discretion (1) in dividing the marital estate as it did
and (2) in awarding tort damages to Shama. We affirm.
Background
          Wasim and Shama married in Pakistan in March 1985. The couple moved to
New York City in 1989, where Wasim began his residency and eventually worked in
a hospital emergency room. Shama did not work outside the home. They had three
children, who were 13, 14, and 17 years old at the time of trial in October 2004. The
family moved to Houston in 1999. Wasim continued his emergency-room work out
of town part of the week and maintained a private practice, which he began in 2001,
in Houston the rest of the week.
          Shama presented evidence that, throughout their entire marriage, Wasim
sexually and physically assaulted her, sometimes in front of the children, and also
physically abused the children. She also presented evidence that, over a 10-year
period, Wasim did not report as income large sums of cash that he earned through
various means and that, against her will, he sent $2,090,000 of this cash to his
extended family living in Virginia and in Pakistan. She also presented evidence that
Wasim committed adultery before they were separated. Wasim denied these
allegations and produced controverting evidence.
 
          The couple separated in December 2003, after Wasim assaulted and choked
Shama until she blacked out. On January 21, 2004, Shama applied for (and quickly
obtained) protective orders to protect her and the children from Wasim and filed suit
for divorce, eventually alleging insupportability, cruel treatment by Wasim, and
Wasim’s adultery as grounds.


 She sought a disproportionate division of community
property, alleging in support, among other grounds, Wasim’s fault in the break-up,
his fraud on the community, his wasting of community assets, and gifts that he had
made during the marriage. Shama also asserted the following as tort claims: assault,
intentional infliction of emotional distress, breach of fiduciary duty, actual and
constructive fraud, waste of assets, fraudulent transfers of community property,
economic duress, monies had and received, and conversion. Shama sought actual and
exemplary damages; an equitable accounting; an audit from Wasim and of Highland
Medical Center, P.A.; a receivership of Sheik & Sheik Investments, Inc. and Al-Karim International, Inc.; and costs and attorney’s fees. Wasim counter-petitioned
for divorce, alleging cruel treatment by Shama. 
          The case was tried to the court in October 2004. The trial court rendered its
first decree in December 2004. Wasim moved for new trial, which the trial court
denied in all aspects except for one that is not relevant to Wasim’s complaints on
appeal. Thereafter, in March 2005, the trial court vacated the December 2004 decree
and rendered a new final decree. In its March 2005 final decree, the trial court,
among other things, (1) divided the marital estate disproportionately; (2) awarded
Shama an owelty judgment of $632,000 to equalize the property division;


 (3)
awarded Shama $330,000 in actual damages against Wasim on her claims of assault
and actual fraud against her personally; (4) denied Shama’s request for exemplary
damages; (5) denied her claim for intentional infliction of emotional distress; (6) and
denied all relief not expressly granted. The trial court entered original and
supplemental findings of fact and conclusions of law. Wasim appeals.
Standards of Review Applicable to All Challenges
A.      Standards of Review for Findings of Fact and Conclusions of Law
          Findings of fact in a case tried to the court have the same force and dignity as
a jury’s verdict upon jury questions. City of Clute v. City of Lake Jackson, 559
S.W.2d 391, 395 (Tex. Civ. App.—Houston [14th Dist.] 1977, writ ref’d n.r.e.). The
trial court’s findings of fact are not conclusive when, as here, we have a complete
reporter’s record. Middleton v. Kawasaki Steel Corp., 687 S.W.2d 42, 44 (Tex.
App.—Houston [14th Dist.] 1985), writ ref’d n.r.e., 699 S.W.2d 199 (Tex. 1985). 
The trial court’s findings of fact are reviewable for legal- and factual-sufficiency of
the evidence using the same standards that are applied in reviewing the sufficiency
of the evidence underlying jury findings. Vannerson v. Vannerson, 857 S.W.2d 659,
667 (Tex. App.—Houston [1st Dist.] 1993, writ denied). In contrast, we review
conclusions of law de novo. See BMC Software Belgium, N.V. v. Marchand, 83
S.W.3d 789, 794 (Tex. 2002).
B.      Standards of Review for Sufficiency Challenges
          When, as here, an appellant attacks the legal sufficiency of an adverse finding
on an issue for which he did not have the burden of proof, he must demonstrate that
there is no evidence to support the adverse finding. Croucher v. Croucher, 660
S.W.2d 55, 58 (Tex. 1983). Such a no-evidence challenge will be sustained when
“‘(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to prove
a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere
scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.’” 
King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003) (quoting Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)).
          In our legal-sufficiency review, “we must view the evidence in a light that
tends to support the finding of disputed fact and disregard all evidence and inferences
to the contrary.” Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d 706, 709 (Tex. 2003). 
Nonetheless, “[t]he final test for legal sufficiency must always be whether the
evidence at trial would enable reasonable and fair-minded people to reach the verdict
under review. . . . [L]egal-sufficiency review in the proper light must credit favorable
evidence if reasonable jurors could, and disregard contrary evidence unless
reasonable jurors could not.” City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005). 
          In reviewing a factual-sufficiency challenge to a fact finder’s finding on an
issue on which the appellant did not have the burden of proof, we consider and weigh
all of the evidence and set aside the judgment only if the evidence that supports the
challenged finding is so weak as to make the judgment clearly wrong and manifestly
unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We must examine both the
evidence supporting and that contrary to the judgment. See Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 242 (Tex. 2001); Plas-Tex, Inc. v. U.S. Steel Corp., 772
S.W.2d 442, 445 (Tex. 1989).
          The fact finder is the sole judge of witnesses’ credibility and the weight to be
given their testimony, and the fact finder may choose to believe one witness over
another. Wilson, 168 S.W.3d at 819 (legal sufficiency); Golden Eagle Archery, Inc.
v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency). Because it is the
fact finder’s province to resolve conflicting evidence, we must assume that the fact
finder resolved all evidentiary conflicts in accordance with its decision if a reasonable
human being could have done so. See Wilson, 168 S.W.3d at 820 (legal sufficiency);
Jackson, 116 S.W.3d at 761 (factual sufficiency). An appellate court may not impose
its own opinion to the contrary of the fact finder’s implicit credibility determinations. 
Wilson, 168 S.W.3d at 819 (legal sufficiency); Jackson, 116 S.W.3d at 761 (factual
sufficiency). 
Division of Marital Property
          In 14 issues, Wasim argues that the trial court abused its discretion in dividing
the parties’ marital property.
A.      The Law
          “In a decree of divorce or annulment, the court shall order a division of the
estate of the parties in a manner that the court deems just and right, having due regard
for the rights of each party and any children of the marriage.” Tex. Fam. Code Ann.
§ 7.001 (Vernon 2006). “The trial court may make an unequal division of the marital
property if there is a reasonable basis for doing so.” O’Connor v. O’Connor, No.
01-06-00445-CV, 2007 WL 1440990, at *6 (Tex. App.—Houston [1st Dist.] May 17,
2007, no pet.). “The division of property must not be so disproportionate as to be
inequitable, and the circumstances must justify awarding more than one-half to one
party.” Hailey v. Hailey, 176 S.W.3d 374, 380 (Tex. App.—Houston [1st Dist.] 2004,
no pet.). Some factors that courts have identified as relevant to division of the marital
estate include (1) the parties’ education; (2) their relative earning capacities; (3) the
size of their separate estates; (4) the community property’s nature; (5) the parties’ age,
health, and physical condition; (6) any fault in breaking up the marriage; (7) the
benefits that the innocent spouse would have derived from the marriage’s
continuation; and (8) the probable need for future support. Id. at 380 & n.5. The
court may also consider in its property division (1) any attorney’s fees that it may
decide to award either party and (2) the parties’ own use of community funds to pay
their attorney’s fees. Grossnickle v. Grossnickle, 935 S.W.2d 830, 846–47 (Tex.
App.—Texarkana 1996, writ denied).
          It was Shama’s burden to show that Wasim transferred community property;
if she carried that burden, then it became Wasim’s burden to show the transfer’s
fairness. See in re Marriage of Notash, 118 S.W.3d 868, 873 (Tex. App.—Texarkana
2003, no pet.).
B.      The Standard of Review Applicable to Divisions of Marital Property
          “We review the trial court’s property division for abuse of discretion.” 
O’Connor, 2007 WL 1440990, at *6. This discretion is broad. Raymond v.
Raymond, 190 S.W.3d 77, 82 (Tex. App.—Houston [1st Dist.] 2005, no pet.). “The
test of whether the trial court abused its discretion is whether the court acted
arbitrarily or unreasonably, and without reference to any guiding principles.” Hailey,
176 S.W.3d at 380. “If the division of marital property lacks sufficient evidence in
the record to support it, then the trial court’s division is an abuse of discretion.” 
Raymond, 190 S.W.3d at 83. Nonetheless, “[u]nder an abuse of discretion standard,
legal and factual insufficiency are not independent reversible grounds of error but are
rather relevant factors in assessing whether the trial court abused its discretion.” Mai
v. Mai, 853 S.W.2d 615, 618 (Tex. App.—Houston [1st Dist.] 1993, no writ). If we
find reversible error that materially affects the trial court’s just and right division of
community property, we must remand the cause for a new division of the community
estate. Jacobs v. Jacobs, 687 S.W.2d 731, 733 (Tex. 1985); Raymond, 190 S.W.3d
at 82.
C.      The Challenges
          Wasim challenges three items awarded to him as part of the division of
community property, i.e., in essence charged against his part of the community-property division: (1) half of the $2,090,000 that the trial court found that he had
transferred to his family, (2) $75,000 in cash that he had taken from a safe in the
family’s home, and (3) $72,500 in funds from a joint savings account.
 
 
          1.       Awards and Findings Based on Wasim’s Transferring $2,090,000 to
His Family
 
                    a.       Pertinent Findings of Fact and Conclusions of Law
          The trial court’s relevant findings of fact were as follows. First, the trial court
found that Wasim had, over about a 10-year period, transferred community funds in
cash to his extended family members in the total amount of $2,090,000. The court’s
findings of fact also incorporated the division of marital property from the decree,
which in turn awarded Wasim half of that transferred amount—$1,045,000—as his
own property. The trial court’s fact findings also recited that the trial court had
considered, as part of the just and right division of community property and among
other factors, Wasim’s fraud on the community estate and the owelty equalization
judgment that it was awarding Shama. As for the owelty equalization award, the trial
court recited, as a finding of fact that
[o]n the claims of conversion, money had in [sic] received, breach of
fiduciary duty, economic duress, waste of assets, and fraudulent transfer
of property, the court finds in favor of Shama Sheikh and against Dr.
Wasim Ahmed Sheikh and has incorporated its findings of damages
against Dr. Wasim Ahmed Sheikh in its owelty award in division of
property and no separate award in tort is made by this court on these
claims.

The trial court also found that a just and right division of the community estate
included an owelty award of $632,000 in favor of Shama.
 
          The trial court’s pertinent conclusions of law were as follows. First, the trial
court recited that it had “ordered a division of the estate of the parties,” including the
$1,045,000 award to Wasim and the owelty award to Shama (both of which took into
account the monies that Wasim had transferred during the marriage), “in a manner
that the court deem[ed] just and right, having due regard for the rights of each party
and the children of the marriage.” Second, the trial court concluded that Shama was
not a party to any fraud committed by Wasim.
                    b.       Wasim’s Challenges



          In issue one, Wasim argues that legally and factually insufficient evidence
supports the trial court’s finding that he transferred $2,090,000 in community funds
to his family. In issues two and three, Wasim argues that the trial court erred in
awarding him half of this amount—$1,045,000—as his portion of the marital property
because, in essence, legally or factually insufficient evidence supports the trial court’s
related findings of fact. In issues three through five and seven through twelve,
Wasim also argues that the trial court abused its discretion in awarding Shama an
owelty of $632,000 because, in essence, legally and factually insufficient evidence
underlies the findings of fact supporting the award.
                    c.       Analysis
          The relevant evidence, considered in the light required for a legal-sufficiency
challenge,


 is as follows. Wasim’s reported monthly income, from his emergency-room and private practice, was $46,324.42 gross and over $24,500 net, which
included about $1,000 to $2,000 each month in cash that his private-practice patients
paid for insurance deductibles and co-pays. However, Shama testified that Wasim
earned an additional $18,000 to $25,000 in cash from his private practice each month
that he did not report, although this sum varied depending on how many patients
Wasim saw each month. This additional, unreported, cash income came from “self-paid” patients of his private practice, for whom Wasim offered a special discounted
rate. Wasim instructed Shama that cash payments made by self-paid patients were to
be “kept separate” and “not to be declared as income.” Likewise, Wasim instructed
one of his former office workers, Laura Wilson, not to make deposit slips for cash
payments, but to place the cash in a drawer. To Wilson’s knowledge, the cash that
she put aside during her two-month employment with Wasim was not reported. 
          Shama also testified that Wasim had earned additional, unreported cash before
and after starting his private practice by
writing prescriptions for people and charging them cash. The
prescription pads came from hospitals where he worked in the ER. He
had brought in letterheads from those hospitals. He was selling that
documentation to anyone who would be willing to buy that and present
that in the American Consulate in Pakistan to show that this person has
a medical need and they need to come here for treatment and that was a
way they would get a visa on that. . . . Then he was also writing a lot of
prescriptions for Viagra and other such stuff, controlled substance,
prescriptions he was writing. He was also doing documentation for
people who were either involved in auto accidents or other accidents
stating that the pre-existing condition was actually the present condition.

          Wasim kept the cash that was collected and not reported as income in the
household safe, to which Shama did not have the combination. Not long before the
parties separated, Wasim told Shama that the safe contained $75,000 in cash at that
time, which was representative of the kinds of sums that Wasim would keep in the
safe. Shama never had access to the cash.
          Wasim sent this cash back home to his family in “great amount[s].” Shama
calculated that, in total, Wasim sent the following sums to his extended family during
the parties’ marriage:
●to Hamida Bano, his mother, in Pakistan (for residential property). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$350,000
 
●to Shahnaz Azhar and Azhar Hassan, his sister and brother-in-law, in Virginia (for residential property). . . . . . . . . . . . . . . .$400,000
 
●to Shaikh Nadeem Ahmed, his brother, in Pakistan (for
commercial property). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$800,000
 
●to Shaikh Nadeem Ahmed, his brother, in Pakistan (for
commercial real property). . . . . . . . . . . . . . . . . . . . . . . . . . . . $450,000
 
●to Ayesha and Ijaz Ahsan Durrani, his sister and brother-in-law,
in Pakistan (for residential property). . . . . . . . . . . . . . . . . . . . .$40,000
 
●to Fauzia, his sister, and her husband, in Pakistan (for residential
property). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$50,000

Total: $2,090,000

Wasim also declared his parents as dependants on his income-tax statements for three
years. Furthermore, although Wasim’s sister (to whom Shama alleged that Wasim
gave $400,000) made only $8 per hour and her husband made around $40,000
annually, they purchased their home for $400,000, with $40,000 down and $360,000
in financing with no co-signers on the note, despite their modest incomes.
          Shama got these totals from a small black diary in which Wasim noted all the
transfers that he had made to his family over a 10-year period. Wasim kept the diary
in his pocket except when he was showering; it was during these short periods that
Shama would peek in the diary to write down figures. Shama never told Wasim that
she looked in his diary. She had no photocopier in the house to copy the diary’s
pages, and she was afraid that if she took the diary to copy it outside the house,
Wasim would find out and kill her.
          To transfer this cash, Wasim generally used a system called hawallah. Shama
described hawallah as “money laundering by illegal means” and explained that it
entailed the sender’s giving cash to a middle man; the middle man’s issuing the
sender a check; the sender’s conveying the check to the recipient in Pakistan; and the
recipient’s cashing the check in Pakistan to receive the cash. Whenever Shama was
in the car with Wasim as he went to conduct a hawallah transaction, he would not
allow her to accompany him inside where the transaction was made.
          The cash that Wasim sent to his family in Pakistan was generally used to
purchase properties. Although Shama asked that he place title to the properties that
he was purchasing in Pakistan in one of their names, Wasim refused, saying that he
did not have time to go to Pakistan to sign paperwork and that his family “wouldn’t
mind giving [the properties] to the kids later on.” Shama produced what she testified
were photographs of some of the Pakistani properties that her husband had purchased
for his family members. Shama testified that Wasim’s brother and sister-in-law had
shown her these properties when she had visited Pakistan in 2001. Finally, Shama
produced an e-mail, dated December 24, 2003, from Wasim to his nephew, which 
recited, “I think you should get the 1 canal residential plot and a commercial plot. 
Check all the details and tell me how much is the total cost on the purchase. Right
now I will sent [sic] $75000/ - to Baji and then she can send it to you. If you need
more let me know.”
          Wasim told Shama that he “was investing all of his money back home” in
Pakistan because “[h]e was planning to go back one day because conditions over here
were not so good for Pakistani people.” When Shama questioned him about his
motives, Wasim would angrily tell her that “it was his money and he can do whatever
he wants to do with it.” Shama did not approve of or consent to these gifts of monies
for the benefit of Wasim’s family. She also did not have access to the $2,090,000 that
Wasim transferred to his family. 
          The above is some evidence that Wasim transferred $2,090,000 cash from the
community’s assets to his extended family without Shama’s approval. Contrary to
Wasim’s arguments on appeal, any lack of documentation supporting Shama’s
testimony did not render her testimony incompetent or of no evidentiary value, even
though she was an interested witness; rather, the absence of such corroborating
documentation went instead to her testimony’s credibility and the weight to be
accorded it—matters that we may not consider in a legal-sufficiency review. See
Wilson, 168 S.W.3d at 827 (providing that, in legal-sufficiency review, appellate
court may not reweigh evidence or make credibility determinations); see also
Greenway Bank & Trust of Houston v. Smith, 679 S.W.2d 592, 597–98 (Tex.
App.—Houston [1st Dist.] 1984, writ ref’d n.r.e.) (providing that “[t]he
uncorroborated testimony of an interested witness is not binding upon a jury, but
merely raises an issue of fact” and that jury is “free to reject an interested witness’
uncorroborated testimony by observation of his demeanor, attitude, and similar
factors incapable of reproduction in the written record.”) (emphasis added); Kirtley
v. Kirtley, 417 S.W.2d 847, 853 (Tex. Civ. App.—Texarkana 1967, writ dism’d
w.o.j.) (in divorce case in which property division was appealed, recognizing that
“[g]enerally the testimony of an interested party, when not corroborated, does not
conclusively establish a fact even when uncontradicted, but only raises an issue of
fact for a jury.”) (emphasis added).


 Our conclusion and this authority is in accord
with the rules concerning interested witnesses’ testimony generally. See In re Doe
4, 19 S.W.3d 322, 325 (Tex. 2000) (“[T]rial courts . . . are given great latitude in
believing or disbelieving a witness’s testimony, particularly when the witness is
interested in the outcome.”); Gevinson v. Manhattan Constr. Co. of Ok., 449 S.W.2d
458, 467 (Tex. 1969) (“The general rule is that evidence given by an interested
witness, even though uncontradicted, presents an issue to be determined by the trier
of fact.”); Cochran v. Wool Growers Cent. Storage Co., 140 Tex. 184, 191, 166
S.W.2d 904, 908 (1942) (“It is the general rule that the testimony of an interested
witness . . . , though not contradicted, does no more than raise a fact issue to be
determined by the jury.”). We thus hold that the evidence was legally sufficient to
support the complained-of findings.
          Wasim’s factual-sufficiency challenge is based on the following evidence,
which is viewed in a neutral light:



1.Wasim testified that, from 1990 through July 1997, he earned in
the $30,000 range annually, most of which was spent supporting
his family in New York City.
 
2.Wasim testified that, for the entire period from 1998 to the time
of trial in October 2004, his combined, total income was
$2,162,000 before taxes. 
 
3.Wasim testified that, during that eight-year period, he supported
his family and bought cars and a home in Houston. 
 
4.Wasim began his private practice in June 2002. He began with
few patients, from which he argues on appeal that he could not
have generated enough cash payments to send $2,090,000 to his
family. 
 
5.Wasim denied having sent money to his sister in Virginia. So did
his sister. He also denied having sent money to his family in
Pakistan other than $22,500, some of which represented Ramadan
tithe money that he sent to be distributed in Pakistan to the poor. 
Shama admitted that the only written documentation of cash
transfers to Pakistan was the documentation for these $22,500 in
transfers.
 
6.Wasim testified that the December 24, 2003 e-mail from him to
his nephew was simply the nephew’s query as to whether Wasim
wanted to purchase property in Pakistan.


 Wasim denied having
invested money in real estate in Pakistan.
 
7.Shama admitted that most patients of Wasim’s private practice
paid their insurance co-payments by check or credit card, rather
than by cash. 
 
8.Wasim denied ever having failed to report any income that he had
received from any source, including cash payments made by his
patients.



 
9.Wasim also denied ever having heard of hawallah or having used
it to transfer money to his family in Pakistan. Shama never
produced the hawallah middle man at trial.

In sum, Wasim relies on this evidence to demonstrate that the $2,090,000 of
community funds that the trial court found that he had diverted “never existed and
[was] never diverted.”
          Much of the evidence on which Wasim relies is simply evidence that the trial
court could have either believed or rejected. The trial court evidently rejected it in
favor of Shama’s testimony. That credibility call was for the trial court to make and
not for this Court to second-guess. See Jackson, 116 S.W.3d at 761. Wasim’s
factual-sufficiency argument also stands on his conclusion that the total amount of
his reported income, less taxes and expenses, for the last 10 years would not have
allowed him to send over $2 million to his family. However, Shama’s testimony was
that Wasim took in large sums of unreported income, on which he did not pay taxes,
over an approximately 10-year period. The trial court was within its discretion in
believing Shama’s testimony that that unreported income was substantial and was
what Wasim used to make the $2,090,000 in transfers to his family. The lack of
documentary evidence for Shama’s testimony went to her credibility and the weight
to be given her testimony, not to its competency. See Smith, 679 S.W.2d at 597–98;
Kirtley, 417 S.W.2d at 853. We hold that the cited evidence does not render Shama’s
contrary evidence so weak as to make the findings of fact or the judgment manifestly
unjust. Neither would the cited evidence render the findings of fact or the judgment
against the great weight and preponderance of the evidence, even if that were the
proper standard of review for this adverse finding. See Cain, 709 S.W.2d at 176
(providing that, in reviewing factual-sufficiency challenge to finding, like that here,
on issue for which appellant did not have burden of proof, appellate court sets aside
judgment only if evidence that supports challenged finding is so weak as to make
judgment clearly wrong and manifestly unjust).
          According to Wasim’s calculations on appeal, and including the $1,045,000
awarded to Wasim and the $632,000 in owelty awarded to Shama, the trial court
awarded net community assets of $1,444,726.91 to Wasim and of $1,242,374.67 to
Shama. Also according to Wasim’s calculations on appeal, this was a division of
53.76% in favor of Wasim and of 46.24% in favor of Shama. Besides his arguments
concerning the legal- and factual-sufficiency of the evidence underlying the trial
court’s finding that Wasim transferred $2,090,000 to his family, which we have
already overruled, Wasim does not otherwise explain how this percentage division
is not just and right. Accordingly, we hold that the trial court did not abuse its
discretion in dividing the parties’ estate as it did.
          We overrule issues one through five and seven through twelve.



          2.       Awards and Findings Based on Wasim’s Taking $75,000 from the
Household Safe

          In its decree, the trial court awarded Wasim, as part of the division of marital
property, $75,000 in cash that was kept in a household safe, that had disappeared after
suit was filed and before trial, and that Shama contended that Wasim had sent to his
family. The court’s findings of fact incorporated the division of marital property from
the decree, which in turn listed this asset, its value, and its award to Wasim. The trial
court’s pertinent conclusion of law was that it had “ordered a division of the estate
of the parties,” including this asset, “in a manner that the court deem[ed] just and
right, having due regard for the rights of each party and the children of the marriage.”
          In issue 13, Wasim argues that the trial court abused its discretion in awarding
him this $75,000 because the $75,000 never existed. In support of this argument,
Wasim also contends that legally and factually insufficient evidence underlies the
trial court’s relevant findings.
          Viewing the evidence in the light most favorable to the trial court’s findings,
we note that Shama testified that (1) Wasim did not report many cash payments that
he received in his private practice and otherwise; (2) he kept those unreported funds
in the safe in the house; (3) he told Shama that he had $75,000 cash in the household
safe soon before the couple separated; (4) she did not have the combination to the
safe; and (5) he took the safe’s contents after suit was filed and did not give her an
accounting of what he did with the money therein. She also testified that he “would
send [cash] back home to his family” in large amounts. Finally, the December 24,
2003 e-mail from Wasim to his nephew recited, “I think you should get the 1 canal
residential plot and a commercial plot. Check all the details and tell me how much
is the total cost on the purchase. Right now I will sent [sic] $75000/ - to Baji and
then she can send it to you. If you need more let me know.”
          We hold that this is some evidence, when viewed in the required light, that
Wasim kept unreported, community, cash earnings in the home safe; that he removed
the cash from the safe shortly after suit was filed; that the cash in the safe at that time
totaled $75,000; that that money may have been sent soon thereafter to his family in
Pakistan; and that, in any event, Shama never received any of that cash or consented
to its disposition. We thus hold that the evidence was legally sufficient to support the
findings relating to the disposition of this $75,000.
          The gist of Wasim’s factual-sufficiency challenge is that the only evidence of
the $75,000 came from “the mouth of the wife,” without supporting documentation,
and that although Shama testified that she did not receive any of these monies, “we
never hear anything else about” them. This is, in essence, an argument that Shama’s
testimony was not credible and that no or little weight should be accorded it. 
Contrary to Wasim’s implicit request, we cannot consider matters of credibility or
second-guess the weight that the fact finder accorded the evidence in either a legal-
or a factual-sufficiency challenge. See Wilson, 168 S.W.3d at 827 (legal sufficiency);
Jackson, 116 S.W.3d at 761 (factual sufficiency). Shama’s testimony alone would
have sufficed to establish the existence and disposition of the $75,000. But her
testimony was not unsupported: she also produced the e-mail from Wasim to his
nephew, dated shortly before suit was filed, in which Wasim stated that he was
sending $75,000 and in which he discussed the purchase of property. Although
corroborating evidence was not necessary for Shama’s testimony to constitute some
evidence, this e-mail did corroborate it. We hold that the evidence supporting the
relevant findings is not so weak as to make the judgment clearly wrong and
manifestly unjust. We thus further hold that the evidence is not factually insufficient
to support the relevant findings. 
          Given that the evidence supporting the trial court’s relevant findings was
neither legally nor factually insufficient, and the fact that Wasim does not explain
how the trial court otherwise might have abused its discretion regarding this asset,



we also hold that the trial court did not abuse its discretion in dividing this asset as
it did. We overrule issue 13.
          3.       Awards and Findings Based on Wasim’s Taking $72,500 from an
ING Joint Savings Account

          In its decree, the trial court awarded Wasim, as part of the division of marital
property, $72,500 that Wasim had transferred pretrial from an ING joint savings
account into his personal account and for which Shama alleged at trial that she had
not received an accounting. The trial court’s findings of fact incorporated the
division of marital property from the decree, which in turn listed this asset, its value,
and its award to Wasim. In its findings, the trial court also recited that the factors that
it had considered in making a just and right division of the parties’ community estate
were, in part, Wasim’s fraud on the community; the benefits that the innocent spouse
(Shama) might have derived from the continuance of the marriage; disparity of the
spouses’ earning power and their ability to support themselves; the spouses’
education and future employability; the community’s indebtedness and liabilities; the
spouses’ earning power, business opportunities, capacities, and abilities; the spouses’
need for future support; the nature of the property divided; and “attorney’s fees to be
paid.” The trial court’s pertinent conclusion of law was that it had “ordered a division
of the estate of the parties,” including this asset, “in a manner that the court deem[ed]
just and right, having due regard for the rights of each party and the children of the
marriage.”
 
          In issue 14, Wasim argues that the trial court abused its discretion in awarding
to him this $72,500 because much of that amount had already been expended on
Shama’s former attorney’s fees and for her support.


 In support of this argument,
Wasim also contends that legally and factually insufficient evidence underlies the
trial court’s relevant findings.
          Wasim admitted below that he withdrew $72,500 from the ING joint savings
account on January 14, 2004 and deposited it into a personal account under his name
only. Although Shama testified that Wasim did not give her an accounting of the
funds that he had withdrawn from this account, she clarified on cross-examination
that she had meant only that Wasim had not accounted to her for those funds. In fact,
at trial, Wasim produced a letter from his attorney to Shama’s attorney, dated three
months before trial, in which his attorney gave an accounting of the $72,500 from this
account: (1) $40,000 of it was paid to Wasim’s former attorneys (Cooper & Scully
for $15,000) and his current ones (Conner & Lindamood for $25,000), (2) $25,000
of it was paid to Shama’s former attorneys (Short & Jenkins), and (3) $9,000 was paid
to Shama as her first support payment.


 This letter was admitted into evidence, it
was supported by Wasim’s testimony, the correctness of the letter’s accounting was
not disputed by Shama when she was cross-examined on it, and Shama does not
attack the letter’s veracity on appeal. Therefore, the evidence conclusively shows that
the $72,500 that Wasim transferred from this account was spent on his former and
present attorney’s fees, Shama’s former attorney’s fees, and Shama’s support
payment. That is, the evidence conclusively demonstrates that the portion of this joint
account that was paid to or on behalf of Shama was $32,500 ($25,000 for her former
attorney’s fees, plus $7,500 of $9,000 paid to her for support).
          Nonetheless, we hold that Wasim has not demonstrated that the trial court
abused its discretion in awarding the $72,500 from this account to Wasim in its
property division. “The trial court has great discretion in deciding whether to award
attorney’s fees to either party” in a suit for divorce. Grossnickle, 935 S.W.2d at 846. 
“This same principle applies to whether the trial court should consider a party’s
payment of attorney’s fees out of community funds in the division of the property.” 
Id. “The allocation of attorney’s fees is a factor to be considered by the court in
making an equitable division of the community estate.” Id. at 847. “Prior payments
out of the community estate to attorneys in the divorce action are likewise to be taken
into account in the division of the marital estate.” Id. 
          The trial court’s decree ordered that each party bear its own costs and
attorney’s fees as part of the property division; however, the trial court specified that
the fees for which it was ordering the parties to be responsible were those incurred
by their current attorneys at the time: for Shama, Nichols Law, P.L.L.C.; for Wasim,
Conner & Lindamood. The trial court’s findings of fact also recited that the court had
considered “the attorney’s fees to be paid” in its determination of a just and right
division of the community estate. 
          $40,000 of the funds that Wasim withdrew from this joint ING account were
spent on his own attorney’s fees, both those to his current attorney’s firm of Conner
& Lindamood and those to his former attorney’s firm of Cooper & Scully. Because
it was within the trial court’s discretion to consider attorney’s fees, like these, that
were paid out of community assets in its just-and-right property division, it was also
within the trial court’s discretion to award Wasim monies that he had already spent
on his own attorney’s fees. See id. at 846–47. Moreover, the trial court also ordered
Wasim to pay his own attorney’s fees with respect to the firm of Conner &
Lindamood, and Wasim does not complain of that portion of the decree on appeal. 
          It was likewise within the trial court’s discretion to make Wasim accountable
for community funds that had been expended on Shama’s former attorney’s fees as
part of the court’s community-property division, especially given that the trial court
had also found that Wasim’s adultery and his having made the marriage “intolerable,
unendurable and incapable of being borne” for and by Shama due to his conduct
(including multiple assaults) justified the divorce and given its findings concerning
the parties’ respective earning power, among other factors. See id. And although the
trial court expressly made Shama responsible for her attorney’s fees incurred to her
current attorneys at Nichols Law, P.L.L.C., it did not make her responsible to pay her
own fees incurred to her former counsel at Short & Jenkins. We thus deem the trial
court to have taken into account, in its division of the community estate, Shama’s fees
to Short & Jenkins, which Wasim had already paid from the $72,500 that he withdrew
from the joint ING savings account. 
          That leaves for our consideration the $7,500 that was paid to Shama out of this
joint account for her support. Wasim does not explain how the assessment of this
relatively small sum constitutes an abuse of discretion given the court’s otherwise
broad discretion in dividing the community estate, the findings that the court made
concerning Wasim’s behavior, the parties’ relative earning capacities, and like
circumstances.
          We overrule issue 14.
Denial of Motion for New Trial
          In issue six, Wasim argues that the trial court abused its discretion in denying
his motion for new trial based upon newly discovered evidence.
          “It is incumbent upon a party who seeks a new trial on the ground of newly
discovered evidence to satisfy the court first, that the evidence has come to his
knowledge since the trial; second, that it was not owing to the want of due diligence
that it did not come sooner; third, that it is not cumulative; fourth, that it is so material
that it would probably produce a different result if a new trial were granted.” Jackson
v. Van Winkle, 660 S.W.2d 807, 809 (Tex. 1983), overruled on other grounds by
Moritz v. Preiss, 121 S.W.3d 715 (Tex. 2003). “In passing on a motion for new trial
on the ground of newly discovered evidence, the court will take into consideration the
weight and the importance of the new evidence and its bearing in connection with the
evidence received at trial.” Id. We review the trial court’s denial of a motion for new
trial asserting the ground of newly discovered evidence for abuse of discretion, and
make every reasonable presumption in favor of the trial court’s denial. Id. at 809–10.
          In his motion for new trial, Wasim relied on the following evidence that he did
not produce at trial: (1) a report by a computer-forensic expert, whom an engagement
letter shows that Wasim hired after trial, opining that the December 24, 2003 e-mail
from Wasim to his nephew concerning property in Pakistan could have been altered
and was “suspect”; (2) certified documents from the Development Authority in
Lahore, Pakistan, averring that certain of Wasim’s family members had no real
property in their names in Lahore; (3) affidavits from most of Wasim’s family
members that they did not hold real property in Lahore in their names and from one
family member describing the sole piece of property that he held; and (4) certain
documents relating to Wasim’s sister and brother-in-law’s closing on their $400,000
home in Virginia and their tax returns, which Wasim argues demonstrate that his
sister’s trial testimony “was true.” Wasim also complains on appeal that he was
“utterly surprised” by Shama’s trial list of monies that she alleged that he had sent to
his extended family.
           Although Wasim asserts on appeal that he “had no notice of the existence of
[this] evidence before trial” and that he “used due diligence before trial to discover”
it, the record from trial and from the new-trial hearing belies that assertion. For
example, concerning the December 24, 2003 e-mail, Shama produced it in discovery
in hard copy in April 2004, nearly six months before trial, and in electronic form
more than 10 days before trial. On July 23, 2004—about three months before
trial—Wasim’s attorney wrote to Shama’s attorney, referencing the e-mail and
indicating that Wasim claimed that it was “fabricated.” Moreover, excerpts from
Wasim’s pre-trial deposition, read at trial and produced in Shama’s response to his
new-trial motion, show that when Wasim was questioned about this e-mail, he merely
explained its meaning, without expressing surprise at not having known of it before
or questioning its accuracy. The fact that he knew of the e-mail months before trial
and had an electronic version within two weeks of trial demonstrates that the trial
court did not err if it concluded that Wasim did not show due diligence in obtaining
his computer-forensic expert’s report.
          Regarding Shama’s list of monetary transfers, Wasim was shown such a list at
his deposition about two weeks before trial. In that deposition, he denied the
transfers and commented that Shama should “bring . . . on” any proof that she had in
support. During her deposition around two weeks before trial, Shama testified that
Wasim’s brothers and sisters had taken her to see their family’s properties in Pakistan. 
And about a week before trial, Shama’s attorney sent Wasim’s attorney the
photographs of what she contended were the real properties owned by his family in
Pakistan, as well as documents from the local Pakistani government that she
contended verified his family’s ownership. Shama also attached to her response to
Wasim’s motion for new trial her affidavit, in which she averred that, at her pre-trial
deposition, she had disclosed to Wasim’s counsel that she was claiming that Wasim
had transferred 2,090,000 in unreported cash to his family in Pakistan, using
hawallah, and to his sister in Virginia. The fact that, before trial, Wasim had seen
Shama’s list of transferred funds, that he had seen the photographs of Pakistani
properties that she contended were his family’s, and that his counsel had heard Shama
testify that his family members had also shown her these properties demonstrates that
the trial court did not err if it concluded that Wasim did not show due diligence in
obtaining the affidavits and certifications from his family members or the Lahore
authorities before trial.
          Finally, concerning the closing documents and tax returns of Wasim’s sister
and her husband, his sister testified to those matters at trial. A trial court does not
abuse its discretion in denying a motion for new trial based on newly discovered
evidence that is merely cumulative of evidence admitted at trial. See Jackson, 660
S.W.2d at 809 (providing that it is movant’s burden to show that evidence claimed
to be newly discovered is not merely cumulative of trial evidence).
          Finally, we note that Wasim did not request a continuance before trial in order
to compile evidence rebutting the complained-of materials that he had received before
trial.
          Given the above, we hold that the trial court did not abuse its discretion in
denying Wasim’s motion for new trial based on newly discovered evidence. We
overrule issue six.
Tort Award
          In issues 15 through 21, Wasim argues that the trial court erred in awarding
Shama $330,000 in tort damages apart from the division of marital property.
          In its pertinent findings of fact, the trial court found as follows:
●On the claim of assaults and actual fraud on the person, the court
finds in favor of Shama Sheikh and against Dr. Wasim Sheikh in
the amount of $330,000 in actual damages. The court makes no
award of exemplary damages.
. . .
 
●On the claims of conversion, money had in [sic] received, breach
of fiduciary duty, economic duress, waste of assets, and
fraudulent transfer of property, the court finds in favor of Shama
Sheikh and against Dr. Wasim Ahmed Sheikh and has
incorporated its findings of damages against Dr. Wasim Ahmed
Sheikh in its owelty award in division of property and no separate
award in tort is made by this court on these claims.

The same tort award and substantively similar recitations appeared in the final
judgment. The pertinent conclusions of law stated, “The tort award for assaultive
behavior and fraud on the person of Shama Sheikh is separate and distinct from the
division of property” and “Shama was not a party to any fraud committed by Dr.
Wasim Ahmed Sheikh.”
          In issues 17 through 21, Wasim argues that legally and factually insufficient
evidence underlies the trial court’s award of these tort damages for the following
reasons: (1) an award to Shama of damages for fraud on her person constituted a
double recovery because the court had already awarded an owelty judgment based on
similar grounds; (2) there was legally or factually insufficient evidence of fraud on
the person; and (3) there was legally or factually insufficient evidence to sustain the
actual-damages award for Shama’s claim for assault. We need consider only the
award for assault for reasons that will become apparent below.
          “The elements of assault are the same in both the criminal and civil context.” 
Hall v. Sonic Drive-In of Angleton, Inc., 177 S.W.3d 636, 649 (Tex. App.—Houston
[1st Dist.] 2005, pet. denied). “A person commits an assault if the person: (1)
intentionally, knowingly, or recklessly causes bodily injury to another; (2)
intentionally or knowingly threatens another with imminent bodily injury; or (3)
intentionally or knowingly causes physical contact with another when the person
knows or should reasonably believe that the other will regard the contact as offensive
or provocative.” Id. at 649–50 (citing Tex. Pen. Code Ann. § 22.01(a) (Vernon
Supp. 2006) and Forbes v. Lanzl, 9 S.W.3d 895, 900 (Tex. App.—Austin 2000, pet.
denied)).
          “Non-economic damages include compensation for pain, suffering, mental
anguish, and disfigurement.” Jackson, 116 S.W.3d at 763. Conscious pain and
suffering may be established by circumstantial evidence. E.g., HCRA of Tex., Inc. v.
Johnston, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.). “The
duration of the pain . . . is an important consideration.” Id. The fact finder “is given
a great deal of discretion in awarding an amount of damages it deems appropriate for
pain and suffering.” Id. “Once the existence of some pain and suffering has been
established, . . . there is no objective way to measure the adequacy of the amount
awarded as compensation.” Id. Put another way, “[t]he process of awarding damages
for amorphous, discretionary injuries such as . . . pain and suffering is inherently
difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss.” 
Id.
          Mental-anguish damages, as with most damages, may be proved by direct or
circumstantial evidence; direct evidence is not required, but in the absence of it,
courts should give “close . . . scrutiny of other evidence offered on this element of
damages.” E.g., Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995). As for
proof of mental-anguish damages by direct evidence, “an award of mental anguish
damages will survive a legal sufficiency challenge when the plaintiffs have
introduced direct evidence of the nature, duration, and severity of their mental
anguish, thus establishing a substantial disruption in the plaintiffs’ daily routine.” Id. 
As for proof of mental-anguish damages by circumstantial evidence, “we apply
traditional ‘no evidence’ standards to determine whether the record reveals any
evidence of ‘a high degree of mental pain and distress’ that is ‘more than mere worry,
anxiety, vexation, embarrassment, or anger’ to support any award of damages.” Id.
(quoting J.B. Custom Design & Bldg. v. Clawson, 794 S.W.2d 38, 43 (Tex.
App.—Houston [1st Dist.] 1990, no writ)). Additionally, concerning circumstantial
evidence, “‘some types of disturbing or shocking injuries have been found sufficient
to support an inference that the injury was accompanied by mental anguish.’” Fifth
Club, Inc. v. Ramirez, 196 S.W.3d 788, 797 (Tex. 2006) (quoting Woodruff, 901
S.W.2d at 445) (concerning future mental-anguish damages).
          The evidence viewed in the light most favorable to the judgment shows the
following. Wasim had a long history—spanning the entire 19 years of marriage—of
slapping, hitting (with his hands or objects), beating, pushing, shoving, and pulling
the hair of Shama. The assaults happened “on many occasions”; in fact, Shama
testified that they occurred on “basically a daily basis” while the family was in New
York. The couple’s son and daughter confirmed that their father had abused their
mother on “more than one occasion.” For example, in August 2002, Wasim hit
Shama in the chest with a child’s toy cash register, leaving a substantial, dark bruise. 
One day in December 2003, Wasim hit Shama because she bought a pizza, then
choked her to the point that she blacked out. Two of the Sheikhs’ children confirmed
that this incident occurred. Wasim also beat Shama if she cried or laughed.
          Shama filed three complaints seeking protective orders from Wasim for his
family violence committed in New York. In one of the New York City proceedings,
the parties entered into and signed an agreement to end that litigation; the agreement
contained the following recitation: “Whereas physical and verbal abuse by the
husband caused the wife to seek a temporary order of protection in the Family Court
of the State of New York in the County of Queens.” Shama also obtained a
temporary restraining order from the trial court in Harris County in January 2004 to
protect her and the children from Wasim’s family violence. In February 2004, the
trial court extended that protective order after having conducted a hearing at which
both parties’ counsel were present; in its February order, the trial court recited that,
after having heard evidence and having interviewed the children, it found that Wasim
had committed family violence.
 
          Wasim had sex with Shama throughout the marriage without her consent. 
Wasim also abused her and caused her pain during sex by pulling her hair, slapping
her, pinching her, “using a lot of force,” hitting her, cursing her, calling her “vile
names,” and forcing her to do certain sexual acts against her will. When he made her
have oral sex with him, he would sometimes tell her that she “was too fat and ugly for
him to have regular sex with [her].” Sometimes, Wasim would force Shama to have
sexual encounters with him while she was lying with her daughter in that daughter’s
bed.


 Even when the non-consensual sex occurred in Wasim’s bedroom, the couple’s
daughter would sometimes stand in the doorway or enter the bedroom and witness the
incidents. In January 2004, two days before Shama sought a protective order, Wasim
told Shama that “this was the last time that [she] had to please him” because of the
upcoming divorce and forced her to have oral sex with him. During this incident,
Wasim again refused to shut the bedroom door. 
          Wasim does not separately challenge the sufficiency of the evidence underlying
the trial court’s conclusion that he assaulted Shama. Rather, in issues 19 through 21,
Wasim argues that legally or factually insufficient evidence underlies the damage
award that the court made for his assaults. Specifically, Wasim argues that there is
no or factually insufficient evidence of past or future medical expenses; of past or
future physical pain and suffering; of past or future mental anguish; or of any other
general or special damages. His challenges concern the award of mental-anguish and
physical-pain-and-suffering damages at all; we do not understand him to argue, as an
alternative challenge, that if Shama proved some level of mental-anguish and
physical-pain-and-suffering damages, then $330,000 is too high a figure to
compensate her.
          Shama did not present evidence of past medical expenses or of physical injuries
requiring future medical expenses. She did, however, present ample direct and
circumstantial evidence of past physical pain and suffering and past mental anguish. 
For example, concerning physical pain and suffering, Shama testified that Wasim’s
sexual assaults hurt her; she produced evidence of a substantial bruise that Wasim
made by assaulting her with a child’s toy; and she described in detail the numerous
physical and sexual assaults perpetrated against her, including one assault that caused
her to black out. This was direct and circumstantial evidence of physical pain and
suffering.
          In addition to Shama’s evidence of the severity of the assaults that she endured
for over a decade, the evidence, viewed in the required light for a legal-sufficiency
review, shows that Shama “knew that this [abuse] would never come to an end” and
even contemplated suicide on several occasions. However, “every time that I thought
of [suicide], I thought, what’s going to happen to my children; and that was the only
reason I couldn’t finish myself.”


 Shama saw a psychiatrist twice in April and May,
2004 about her depression and suicidal feelings. Shama also saw an internist in June,
July, and September 2004 for what the doctor described in his notes both as “major
depression” and “depression.” Although this doctor did not give Shama
psychological testing, his notes indicate that she was taking Effexor, an anti-depressant, at varying doses. See Physicians’ Desk Reference 3411 (61st ed.
2007). 
          Shama also testified that she feared for her own safety and thought that Wasim
might kill her. A friend of Shama’s testified that she saw Shama on the day that
Shama and Wasim separated. When the friend’s husband opened the door, Shama
“screamed,” and he knew that “something was wrong with her.” The friend found
Shama in the parking lot; Shama was in her car, crying and “quite upset.” The friend
had seen Shama in such a state on more than one occasion. Shama felt “very bad and
degraded” by the non-consensual, abusive sex that Wasim forced upon her. Wasim
had indicated to Shama that he could do with her whatever he wanted to do. In fact,
the assaults made Shama feel
very upset. I have started thinking that I am nothing and it’s like he can
do whatever he wants to do with me. It feels like I’m worse than even
an animal, he can treat me in whatever manner he wants to treat me.

          The above evidence belies Wasim’s position on appeal that “[t]here is not one
word from [Shama] as to how the alleged assaults . . . affected her mental state”; that
Shama “never testified as to any pain or suffering attributable to these alleged
assaults”; that Shama, “without much more, alleges that she has suffered mentally due
to [Wasim’s] treatment”; and that her mental anguish does not “rise to a compensable
level.” Rather, when viewed in the light most favorable to the judgment, this is some
evidence—both direct and circumstantial—that Shama suffered the type of physical
pain and suffering and mental anguish from Wasim’s numerous and violent assaults
for which the law allows recovery. See Woodruff, 901 S.W.2d at 445 (“As we have
noted, historically, some types of disturbing or shocking injuries have been found
sufficient to support an inference that the injury was accompanied by mental anguish. 
As a general matter, though, qualifying events have demonstrated a threat to one’s
physical safety or reputation or involved the death of, or serious injury to, a family
member.”) (emphasis added); see also id., 901 S.W.2d at 442 (in dictum, noting that,
in historical development of law of mental-anguish damages, “once particularly
disturbing events were proved by reference to objective phenomena or conditions, the
law generally allowed the claimant’s mental suffering to be presumed to flow from
such events. The oldest examples of this category of cases are those involving
assault, slander, and other intentional torts.”) (emphasis added; citations omitted). 
We distinguish the authority on which Wasim relies because, in it, there was no
evidence of the level of abuse or distress that is present here.


 We thus hold that the
evidence is legally sufficient to show that Shama suffered compensable levels of
mental anguish and physical pain and suffering in the past.
          Although also couched in terms of factual sufficiency, most of Wasim’s
argument is that there was no evidence of compensable physical pain and suffering
and mental anguish. The sole factual-sufficiency challenge concerning Shama’s past
physical pain and suffering that we can discern is that Shama’s direct and
circumstantial evidence set out above is undermined by Wasim’s denial that he had
ever assaulted Shama or the children at any time. Of course, it was up to the trial
court to determine which party was credible and what weight to give his or her
testimony. See Jackson, 116 S.W.3d at 761. The trial court made that credibility call
in Shama’s favor—which is not surprising given that, among other things, Wasim’s
denials contradicted both the recitations in the protective-order agreement that he
signed in 1993 and the Harris County trial court’s earlier finding that Wasim had
committed family violence. As for his factual-sufficiency challenge to Shama’s direct
and circumstantial evidence concerning her past mental anguish, Wasim notes that
Shama did not seek counseling or treatment until after suit was filed; she saw doctors
only a few times; neither doctor recorded having tested her to confirm depression; and
neither doctor gave her any “set treatment for these alleged torts.” Again, the weight
to be given to Shama’s direct and circumstantial evidence of her emotional state was
for the trial court to determine, and that court apparently found her evidence credible
and entitled to great weight. We may not disturb those implicit determinations on
appeal. See id. Moreover, we note that Shama testified to suicidal inclinations, she
described feelings of despair and shame, one doctor’s medical records recited that she
was taking an antidepressant, and she endured years of frequent physical and sexual
assaults.
          We hold that the cited evidence does not render Shama’s contrary evidence so
weak as to make the findings of fact or the judgment manifestly unjust. Neither
would the cited evidence render the findings of fact or the judgment against the great
weight and preponderance of the evidence, even if if that were the proper standard of
review for this adverse finding. See Cain, 709 S.W.2d at 176.
          We overrule issues 19 through 21. Because we have overruled Wasim’s
challenges to the trial court’s judgment, findings, and conclusions concerning liability
and damages for assault, and because the tort award is fully supportable on Shama’s
claim for assault, we need not consider Wasim’s challenges (issues 17 and 18) to the
trial court’s judgment, findings, and conclusions concerning fraud on Shama’s
person.
Conclusion
          We affirm the judgment of the trial court.
 
Tim Taft
Justice

Panel consists of Justices Taft, Hanks, and Higley.