**AFFIRMED in part; REVERSE and REMAND in part; and Opinion Filed August 28, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00014-CV**

**ORANGE CUP DRIVE IN LLC, Appellant**
**V.**
**MID-CONTINENT CASUALTY COMPANY, Appellee**

**On Appeal from the 86th Judicial District Court**
**Kaufman County, Texas**
**Trial Court Cause No. 95975-86**

## MEMORANDUM OPINION

Before Justices Osborne, Partida-Kipness, and Pedersen, III
Opinion by Justice Osborne

This is a dispute about insurance coverage for environmental cleanup costs at a convenience store with an inactive gas station. The trial court granted the insurance company's motions for summary judgment and rendered judgment that appellant Orange Cup Drive In LLC ("Orange Cup") take nothing from appellee Mid-Continent Casualty Company ("MCC"). In five issues, Orange Cup contends there were issues of fact and law precluding summary judgment for MCC. For the reasons we discuss, we affirm the trial court's judgment in part and reverse in part.

The facts are well known to the parties and we do not repeat them here except as necessary to explain our decision. *See* TEX. R. APP. P. 47.4. In sum, the insurance company paid some of the losses claimed under the policy but not others, giving as reasons that the insured failed to provide required documentation or that the specific amounts claimed were for damages and expenses not covered under the policy.

## BACKGROUND

Orange Cup is a limited liability company formed in 2012. *See* TEX. BUS. ORGS. CODE Ch. 101 (Limited Liability Companies). Pulak Barua is Orange Cup's registered agent and Shanta Barua is Orange Cup's owner, director, and managing member. In June 2012, Pulak[1] as Lessor and Shanta as Lessee signed a three-year "Commercial Lease" for property described as "Orange Cup Drive In LLC" in Mabank, Texas. The lease provided that "Lessee is responsible to pay . . . insurance and all kind of repair and maintenance work." Orange Cup operates a convenience store on the premises.

Orange Cup purchased pollution liability and environmental damage insurance policy number 04-TO-00089654 from MCC for the period August 1, 2014 to August 1, 2015. The named insured on the policy is "Orange Cup Drive In LLC DBA Orange Cup Drive In." The policy has three coverage parts. In general, Coverage A applies to claims by third parties for property damage caused by a

---

[1] We refer to Pulak Barua and Shanta Barua by their first names for clarity.

release. Coverage B applies to cleanup[2] costs incurred by the insured. Coverage C applies to expenses to repair or replace the storage tank system.

In 2014, Orange Cup decided to open the inactive gas station at the site for retail sale. Orange Cup ordered gasoline and diesel fuel for the purpose of testing the existing tanks and lines at the site. Testing on September 5, 2014, revealed leaks. There were oil releases from the three lines to Orange Cup's gas pumps. The spill permeated the soil. Orange Cup reported the loss to MCC.

MCC appointed HKC & Associates, Inc. ("HKC"), an environmental specialist licensed by the Texas Commission on Environmental Quality ("TCEQ"), to conduct an investigation and testing. HKC reported that the lines at the site were leaking and hydrocarbon concentrations in the soil "could be attributed to the recent release(s) of September 2014." HKC recommended additional testing.

In November 2014, Orange Cup obtained a proposal from T&G Environmental, LLC ("T&G") for excavating and testing "800 yards of Class I contaminated soil" for a total price of $180,200.00, with half due upon signing the contract and half due upon completion of the work. Orange Cup sent the proposals to MCC, and MCC responded.

In eight letters over the course of a year to Orange Cup and in an additional letter to its counsel, MCC agreed there was coverage under Coverage C but denied

---

[2] "Cleanup" is spelled both with and without a hyphen throughout the record and also appears as two words or a single word. We will use the non-hyphenated, single word spelling except in direct quotations.

there was coverage under Coverage A for the particular amounts Orange Cup requested. MCC agreed that Coverage B applied for the cleanup costs for "confirmed releases from three different systems of the storage tank systems," but explained that because "three each claim deductibles of $5,000.00 will apply for a total of $15,000.00," "[t]his means Orange Cup Drive In is responsible for the first $15,000.00 regarding cleanup costs for environmental damage."

In each letter, MCC repeated a request for "a complete and legible copy of all environmental sampling and analysis reports pertaining to the premises location and made by T&G to the Texas Commission on Environmental Quality ("TCEQ"); a complete and legible copy of all reporting made to the TCEQ by T&G pertaining to the premises location; and any documentation produced by the TCEQ to Orange Cup Drive In regarding this matter," so that it could respond to Orange Cup regarding T&G's proposal. MCC explained that this documentation was necessary in order to determine whether T&G's proposal was for cleanup costs that Orange Cup was "legally obligated to pay" for a "confirmed release," defined in the policy as "a **Release**[3] that has been investigated and confirmed by or on behalf of an **Insured** utilizing a system tightness check, site check or other procedure approved by the **Implementing Agency**[4] in accordance with 40 C.F.R. 280.52 or another applicable

---

[3] MCC uses bold type in the policy when referring to the policy's defined terms.

[4] "Implementing Agency" is defined in the policy as the federal Environmental Protection Agency "or a state or local agency having jurisdiction over the **Storage Tank System(s)** pursuant to an underground

federal or state regulation or state statute." In sum, T&G's quote and scope of work did not include the basis—either by testing reports or filings with the TCEQ—for its conclusion that the site contained "800 yards of Class I contaminated soil."

Orange Cup responded by making claims in excess of $3 million—and in excess of the $1 million policy limits under Coverages A and B—for additional damages, including costs to demolish and rebuild the convenience store, business interruption costs, fixtures, inventory, Pulak's (as owner of the property) "stress, anxiety, and depression," and Orange Cup's "stress, anxiety, and suffering." In its letters, MCC consistently denied these claims, but repeated that it "will pay under Coverage B" for claims that were related to environmental damage cleanup costs upon receipt and approval of the requested information.

On May 12, 2015, MCC paid $75,000—the maximum amount available—under Coverage C, but had not paid any amounts under Coverages A or B by August 2016, when Orange Cup filed this suit. In its operative petition, Orange Cup pleaded causes of action for breach of contract, violations of the insurance code, deceptive trade practices, unfair insurance practices, breach of the duty of good faith and fair dealing, and fraud. Orange Cup also alleged that MCC "has waived and is estopped from asserting any coverage defenses, conditions, exclusions, or exceptions to

---

storage tank program approved by the federal E.P.A. in accordance with section 9004 of the Resource Conservation and Recovery Act of 1976, as amended."

coverage not contained in any reservation of rights letter to Plaintiff." Orange Cup sought actual damages, additional damages under the DTPA and the insurance code, exemplary damages, and attorney's fees.

MCC filed a "partial no evidence and traditional motion for summary judgment" on November 10, 2017, and Orange Cup responded. The trial court granted MCC's motion in an order dated March 26, 2018, ruling that specific elements of damages claimed by Orange Cup and by Pulak, the premises owner, were not covered under Coverage A or under Coverage B.[5] The trial court further ordered that Orange Cup "is not entitled to recover damages against [MCC] for stress, anxiety, mental anguish or mental suffering or harm." The trial court's order, however, did not address coverage for the actual cost to clean up the property.

On April 11, 2018, the parties entered into a rule 11 agreement regarding Coverage B. The parties agreed:

- MCC "has no liability under Coverage B for Clean Up Costs (as that term is defined in the Policy) until such time as Orange Cup has satisfied (i.e. paid) applicable the [sic] $15,000 deductible."

- MCC agrees that the policy provides Coverage B for Clean Up Costs "upon payment by Orange Cup of the applicable deductible, subject to the terms and conditions set forth in the Policy."

---

[5] The trial court's order included two tables listing Pulak's claims as owner and the "Insured's Additional Claims" that were not covered under Coverage A or Coverage B. In both tables, the "Owner's Claims" for $115,242.00 in Demolition Costs, $838,622.00 in Rebuild Costs, and $500,000.00 for "Stress, anxiety, depression" were listed as not covered. And in both tables, Orange Cup's additional claims for $240,000.00 in "Business Loss (9/3/14–9/3/15)," $240,000.00 in "Business Loss (9/3/15–9/3/16)," $35,000.00 for "Walk-in cooler," $16,000.00 for "Fuel cost," $40,000.00 for "Fixture & kitchen equipment," $30,000.00 for inventory, $375,000.00 for "Stress, anxiety, suffering," and $500,000.00 for "Relocation cost" were not covered under Coverage A or Coverage B.

- "Expenses actually paid by Orange Cup for testing, assessment, monitoring, reporting, remediation, and/or Clean Up Costs (as that term is defined in the Policy) will be credited towards the deductible applicable to Coverage B."

- MCC must approve in writing expenses for Clean Up Costs beyond the $15,000 deductible, but consent "will not be unreasonably withheld."

- Orange Cup will provide MCC with "all reports, lab results, studies, soil samples, Site Assessments, Corrective Action Plans, expert summaries, etc. prepared on Orange Cup's behalf" and cooperate with MCC's ongoing investigation.

- On satisfaction of the deductible, MCC will pay Clean Up Costs under the policy's terms and conditions "provided that Orange Cup agrees to comply with all requirements, ordinances and laws set forth in the Texas Water Code, the Texas Administrative Code and/or any and all such other similar law with regard to the testing, assessment, monitoring, reporting, removal, remediation, and/or cleanup of any environmental pollution resulting from the Confirmed Release made the basis of Orange Cup's claim under the Policy."

- All terms and conditions of the policy remain the same.

On July 25, 2018, MCC filed a second motion for summary judgment. Relying on the same exhibits it had filed with its first motion and on the rule 11 agreement, MCC argued that because Orange Cup had neither paid the deductible nor provided the documentation to support its claim for "Clean Up Costs" under Coverage B, and adequate time for discovery had passed, MCC was entitled to judgment as a matter of law that it owed nothing under the policy other than the $75,000 it had already paid under Coverage C. Orange Cup responded. The trial court granted the motion, rendering judgment that Orange Cup take nothing under Coverage B and incorporating its March 26, 2018, summary judgment order. This appeal followed.

In five issues, Orange Cup contends the trial court erred by granting summary judgment for MCC. We review the trial court's order granting summary judgment de novo, under well-known standards that we need not detail here. *See Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 131 (Tex. 2019). We also review a trial court's construction of an insurance policy de novo. *See Nautilus Ins. Co. v. Steinberg*, 316 S.W.3d 752, 755 (Tex. App.—Dallas 2010, pet. denied).

## DISCUSSION

## I. Breach of contract

In its first issue, Orange Cup contends the trial court erred by ruling that MCC has not breached the insurance contract. While noting that MCC "honored its obligation for coverage C" to pay for replacement of the storage tanks and the three leaking lines, Orange Cup argues that MCC was obligated to pay additional damages under both Coverages A and B. Orange Cup argues that (1) under Coverage A, MCC was obligated to pay the landlord's damages for oil leaks that had penetrated "into the underground of the building" and the landlord's additional claims, and (2) under Coverage B, MCC was obligated to pay Orange Cup's cleanup costs and related business losses and expenses.

In its second issue, Orange Cup contends that the trial court erred by granting MCC's motion for summary judgment because Orange Cup offered evidence of its damages. Orange Cup argues there is no dispute that there were oil releases from the

three lines of its gas pumps on September 5, 2014, "the oil spill permeated the soil in Appellant's business premises," and the policy covered that event.

In its third issue, Orange Cup contends the trial court erred in holding there was no evidence of contamination of Orange Cup's business premises "even when the expert report shows oil spillage and contamination." Orange Cup relies on the results of testing done by XENCO Laboratories, included in HKC's report, showing the presence of contaminants in the soil.

In its fourth issue, Orange Cup argues the trial court erred by "holding that Appellant has not fulfilled the conditions precedent of the policy, including the deductible." Orange Cup argues it could not incur any cleanup costs without MCC's approval, and MCC has refused to approve T&G's bill for the cleanup costs. Consequently, Orange Cup argues it cannot incur the costs for which it would pay the amount of the deductible, even though it has the "capacity and willingness" to do so. Orange Cup also argues the policy does not state that nonpayment of the deductible "vitiates the contract." Orange Cup explains that MCC's refusal to approve the cleanup has resulted in the total closure of Orange Cup's gasoline business, for which Orange Cup is entitled to damages.

We address these breach of contract issues together. When determining if an insurance policy provides coverage for a claim, the insured bears the initial burden of presenting sufficient facts to demonstrate coverage under the policy. *Gilbert Tex. Constr. v. Underwriters at Lloyd's*, 327 S.W.3d 118, 124 (Tex. 2010). "If the insured

proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion." *Id.* If the insurer does so, the burden then shifts to the insured to prove that an exception to the exclusion brings the claim within coverage. *Id.*

### A. Coverage A

As we have noted, the policy has three coverage parts addressing "release(s)" from "scheduled storage tank systems."[6] Coverage A applies to claims by third parties for property damage caused by a release, providing in part:

> We will pay those sums that an **Insured** is legally obligated to pay as a result of **release(s)** from scheduled **Storage Tank System(s)** commencing after the Retroactive Date which result in **Bodily Injury** or **Property Damage** to which this insurance applies. We will have the right and duty to defend any **claim** seeking those damages.

A "claim" under Coverage A means a "written demand received by an **Insured** seeking a remedy and alleging liability or responsibility on the part of an **Insured** for **Loss**."

MCC argues that Pulak's claims for the cost to demolish and rebuild the convenience store and for "stress, anxiety, [and] depression" are not covered under Coverage A for several reasons: (1) Orange Cup had no "legal obligation" to Pulak because Shanta was the tenant under the lease, not Orange Cup; (2) the policy excluded coverage for liability of others assumed by an insured under a contract,

---

[6] Coverage C addresses expenses to repair or replace storage tank systems. Because there is no dispute that MCC has paid Orange Cup the $75,000 policy limits under Coverage C to replace the tanks and lines and there is no issue on appeal relating to it, we need not quote its specific language.

citing *Gilbert Texas Construction*, 327 S.W.3d at 124; and (3) assuming Orange Cup was the tenant under the lease, the policy excludes damage to property that is in the "care, custody, or control" of the insured.[7]

We pretermit discussion of MCC's first two arguments because we conclude that summary judgment for MCC regarding the cost to demolish and rebuild the convenience store was proper under the third. The policy defines "property damage" as:

1. Physical injury to or destruction of tangible property other than property which is in the care, custody or control of an **Insured** including the resulting loss of use thereof;

2. Loss of use of tangible property other than property which is in the care, custody or control of an **Insured** that has not been physically injured or destroyed.

The summary judgment evidence showed that Orange Cup had care, custody, and control of the premises, including the convenience store and the surrounding property, at the time of the releases on September 5, 2014. Orange Cup insured the premises, wanted to open the inactive gas station there, and had gasoline and diesel delivered to the premises to test the tanks and lines. It hired a company to test the lines, and during those tests, the leaks in the lines occurred. This evidence supports the conclusion that Pulak's claims to demolish and rebuild the store are not covered

---

[7] MCC also argues (1) there is no documentation supporting Pulak's claims that the demolition cost was $115,242.00 and the rebuilding cost was $838,622.00, and (2) it investigated the claims and notified Orange Cup that they were not covered under the policy.

as "property damage" under Coverage A. *See, e.g., Frito-Lay, Inc. v. Trinity Universal Ins. Co.*, No. 05-08-01263-CV, 2010 WL 4705526, at \*3–4 (Tex. App.—Dallas Nov. 22, 2010, pet. denied) (mem. op.) (discussing "care, custody, and control" exclusion in insurance policy).

In addition, MCC established as a matter of law that Coverage A does not cover Pulak's claim for "stress, anxiety, depression" in the amount of $500,000. Coverage A extends to sums the insured is legally obligated to pay "as a result of **release(s)** from scheduled **Storage Tank System(s)** . . . which result in **Bodily Injury**." "Bodily injury" is defined in the policy as:

> B. **Bodily Injury** means physical injury, sickness or disease, mental anguish or emotional distress when accompanied by physical injury, sustained by any person, including death resulting therefrom.

Shanta provided a letter from Pulak as support for Pulak's claim:

> Dear Mrs. Barua,
>
> Since the spill happened I have been suffering stress, depression, and anxiety. So I am entitled to get mon[e]tary damage for that. I am claiming $500,000 for my mon[e]tary damage. In addition to my previous claim my total claim is now $1,634,064.00 Please inform your insurance company about my claim
>
> Sincerely
> Pulak Barua

There is no further summary judgment evidence in support of this claim. Consequently, there is no evidence raising a fact issue that Pulak suffered "mental anguish or emotional distress when accompanied by physical injury" under Coverage A. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (to

–12–

support award of mental anguish damages, record must reveal evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger" to support any award of damages); *see also City of Tyler v. Likes*, 962 S.W.2d 489, 497 (Tex. 1997) ("mental anguish based solely on negligent property damage is not compensable as a matter of law").

We conclude the trial court did not err by granting MCC's motion for summary judgment on the ground that MCC did not breach the provisions of Coverage A. *See Gilbert Tex. Constr.*, 327 S.W.3d at 124 (insured bears burden of presenting sufficient facts to demonstrate coverage).

## B. Coverage B

Coverage B addresses cleanup costs incurred by the insured for environmental damage, providing in part:

> We will pay **clean-up costs** incurred by an **Insured** for **environmental damage** that an **Insured** is legally obligated to pay from scheduled **Storage Tank System(s)** as a result of a **Confirmed Release(s)** provided the **Confirmed Release(s)** commences after the Retroactive Date. All **claim(s)** must be reported to the company, in writing, by the **Named Insured** during the **Policy Period** . . . .

A "claim" under Coverage B means "[a] notice to the Company written by or on behalf of the **Named Insured** reporting a **Confirmed Release** or seeking the payment of **Clean-up Costs**." "**Clean-up Costs**" are defined as "expenses for the removal, remediation or neutralization of contaminants, irritants or pollutants."

### 1. Cleanup costs for environmental damage

MCC does not dispute that it is required by the policy to pay cleanup costs for environmental damage under Coverage B. MCC contends, however, that its obligation to pay is triggered only if Orange Cup is "legally obligated to pay" those costs as a result of a "Confirmed Release." "Confirmed Release" is defined in the policy as we have noted; "legally obligated to pay" is not defined. Under policy exclusion H, "any costs, charges or expenses incurred to investigate or verify that a **Confirmed Release** has taken place" are excluded from coverage "[u]nless required by an **Implementing Agency**."

MCC contends Orange Cup has not shown it is legally obligated to pay cleanup costs. Citing statutory and regulatory provisions regarding underground storage tanks, MCC argues that Orange Cup has not obtained a decision from the TCEQ that corrective action is necessary for the leakage from the lines that occurred on September 5, 2014. In particular, MCC contends that Orange Cup was required to perform a "Site Assessment," which includes "at a minimum, a determination of the degree and lateral and vertical extent of the on-site contaminated area (soil and groundwater) as required by the [TCEQ]." 30 TEX. ADMIN. CODE § 334.78(a)(5). MCC argues that after the underground storage tank's owner or operator performs the site assessment, the TCEQ will decide whether corrective action is necessary and may require a "corrective action plan." *See* TEX. WATER CODE § 26.351 (Corrective Action); 30 TEX. ADMIN. CODE § 334.81 (Corrective Action Plan). Without that

–14–

determination, MCC argues, Orange Cup cannot show its legal obligation to pay cleanup costs.

In her affidavit supporting Orange Cup's first summary judgment response, Shanta testified that "Plaintiff has been in compliance with the regulations with TCEQ and has not have [sic] any violations with TCEQ." In her affidavit supporting Orange Cup's second summary judgment response, Shanta testified that "Plaintiff has filed with TCEQ its intention to commence the clean up the area [sic] for the environmental pollution caused by the leaks." She attached her letter to the TCEQ reporting that Orange Cup "is working with the insurance company to satisfy our clean up cost and other obligations to be fulfilled. As soon as we are gratified with the monetary balance, we will start cleaning up the property and other work that is needed to be done." Orange Cup attached a one-page TCEQ form showing T&G as the contractor.

In its second, third, and fourth issues on appeal, Orange Cup argues there was evidence of damages from the oil releases, evidence of contamination, and evidence it had the "capacity and willingness" to pay the deductible, and the trial court erred by finding otherwise and concluding that these fact issues did not preclude summary judgment for MCC. MCC, however, did not move for summary judgment on any of those grounds. Instead, MCC's motions were founded on its contentions that (1) Orange Cup failed to comply with the policy's requirements, and consequently could not obtain coverage for the leaks that occurred during the September 5, 2014

testing, and (2) the policy did not cover Pulak's and Orange Cup's "additional claims" for damages itemized in the initial summary judgment motion.

In sum, the parties agree that Coverage B covers "cleanup costs," but disagree on the amount of investigation, data, testing, and supporting documentation MCC could require to determine whether the proposed cleanup costs fall within the policy's coverage. Orange Cup contends that HKC's report and accompanying testing is sufficient support for T&G's bid to remove 800 yards of contaminated soil for $180,200, and that MCC (1) should have approved the work without requiring any further documentation and (2) should not have required payment of the deductible before paying under Coverage B. MCC argues it was entitled under the policy to request further documentation, in accordance with applicable law and regulation, to determine if Orange Cup was "legally obligated" to undertake the full extent of the work proposed by T&G where Orange Cup did not authorize the further testing recommended by HKC before retaining T&G.

We conclude that MCC established it did not breach the policy by requesting additional documentation and subsequently denying policy benefits when Orange Cup failed to comply with the request. MCC explained—in writing, on numerous occasions—what documentation it needed and why. Its requests were in accordance with Coverage B's specific terms. Under both the policy and the rule 11 agreement, Orange Cup expressly agreed to cooperate in MCC's investigation of any claim, and MCC's obligation was to pay benefits in accordance with the policy's terms. And

–16–

under the rule 11 agreement, Orange Cup expressly agreed that MCC had "no liability under Coverage B for Clean Up Costs (as that term is defined in the Policy) until such time as Orange Cup has satisfied (i.e. paid)" the deductible. We conclude the trial court did not err by granting MCC's motion for summary judgment on the ground that MCC did not breach the provisions of Coverage B. *See Gilbert Tex. Constr.*, 327 S.W.3d at 124.

### 2. Additional claims

Orange Cup made additional claims for lost business, inventory, fixtures and equipment, a walk-in cooler, fuel cost, relocation cost, and "stress, anxiety, suffering" totaling $1,476,000.00. The trial court's first summary judgment order included the amount of each item in a chart and a ruling that the amounts "are not covered under Coverage B." Under the policy's unambiguous language, as we have discussed, Coverage B covers "cleanup costs," defined in the policy as "expenses for the removal, remediation or neutralization of contaminants, irritants or pollutants." None of Orange Cup's additional claims listed in the trial court's first summary judgment order are "cleanup costs" as defined by the policy, and the trial court did not err by granting summary judgment on the ground that Coverage B did not require MCC to pay them.

Because MCC established its right to judgment as a matter of law on Orange Cup's breach of contract claim, we decide Orange Cup's first, second, third, and fourth issues against it. *See Gilbert Tex. Constr.*, 327 S.W.3d at 124.

## II. Genuine issues of material fact

In its fifth issue, Orange Cup argues that summary judgment was not proper because there were genuine issues of material fact to be determined by a jury, including:

1. whether "there were contaminants in the soil in the business premises";

2. whether MCC "was right in withholding approval to the contractor's quote" based on Orange Cup's failure to pay the deductible where "the deductible was not enough to mobilize the clean up" and MCC did not "approve the bill submitted by the Contractor, T&G"; and

3. whether MCC violated the DTPA or the insurance code, engaged in unfair claim settlement practices, or breached the common law duty of good faith and fair dealing, all "independent of" any breach of the insurance contract.

We have concluded that MCC established its right to judgment as a matter of law on Orange Cup's claims for breach of the insurance policy. Consequently, we disagree that Orange Cup's first two fact questions must be determined by a jury. But neither of MCC's summary judgment motions addressed any of Orange Cup's extracontractual claims other than Pulak's claim for "stress, anxiety, depression" and Orange Cup's claim for "stress, anxiety, suffering." Both of MCC's summary judgment motions included a footnote stating, "Orange Cup has asserted a number of extracontractual claims. Mid-Continent will address those claims by a separate motion if it prevails on this one." Summary judgments "may only be granted upon grounds expressly asserted in the summary judgment motion." *G&H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (per curiam). And "[a] no-evidence motion

that only generally challenges the sufficiency of the non-movant's case and fails to state the specific elements that the movant contends lack supporting evidence is fundamentally defective and cannot support summary judgment as a matter of law." *Jose Fuentes Co., Inc. v. Alfaro*, 418 S.W.3d 280, 283 (Tex. App.—Dallas 2013, pet. denied) (en banc).

Granting summary judgment on a claim not addressed in the motion "is, as a general rule, reversible error." *G&H Towing Co.*, 347 S.W.3d at 297. The supreme court has recognized a harmless error exception to this rule "when the omitted cause of action is precluded as a matter of law by other grounds raised in the case." *Id.* at 297–98. As explained in *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 489 (Tex. 2018), and cases following it, however, some claims for common law or statutory violations may exist even where there is no coverage under the policy. *See Ortiz*, 589 S.W.3d at 133–34 ("As we recently reaffirmed in *Menchaca*, an 'insured's claim for breach of an insurance contract is "distinct" and "independent" from claims that the insurer violated its extra-contractual common-law and statutory duties.'") (quoting *Menchaca*, 545 S.W.3d at 489). And in any event, MCC did not dispute coverage under Coverage C, or even under Coverage B had Orange Cup met the policy's conditions for obtaining it. Where the motion is silent on grounds for summary judgment for the extracontractual claims—and particularly where the motion specifically recites that the claims will be addressed by a separate motion later—we cannot determine whether "the omitted cause of action is precluded as a

matter of law by other grounds raised in the case." *See G&H Towing Co.*, 347 S.W.3d at 297.

"[A] summary judgment cannot be affirmed on grounds not expressly set out in the motion or response." *Stiles v. Resolution Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993); *see also Ineos USA, LLC, v. Elmgren*, 505 S.W.3d 555, 566 (Tex. 2016) (declining to expand harmless error rule to affirm summary judgment on ground not asserted in motion). We cannot affirm the trial court's judgment on grounds not included in MCC's motion. *See Stiles*, 867 S.W.2d at 26. Accordingly, we reverse the trial court's judgment on Orange Cup's claims for (1) violations of the insurance code, (2) DTPA violations, (3) breach of the duty of good faith and fair dealing, and (4) fraud. We express no opinion on the merits of the remaining claims.

## CONCLUSION

We affirm the trial court's judgment as to Orange Cup's breach of contract claims. We reverse the trial court's judgment as to Orange Cup's extracontractual claims that were not addressed in MCC's motions for summary judgment and remand the case for further proceedings.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

190014F.P05

–20–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ORANGE CUP DRIVE IN LLC,
Appellant

No. 05-19-00014-CV     V.

MID-CONTINENT CASUALTY
COMPANY, Appellee

On Appeal from the 86th Judicial
District Court, Kaufman County,
Texas
Trial Court Cause No. 95975-86.
Opinion delivered by Justice
Osborne. Justices Partida-Kipness
and Pedersen, III participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment granting summary judgment on appellant's extracontractual claims. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellee Mid-Continent Casualty Company recover its costs of this appeal from appellant Orange Cup Drive In LLC.

Judgment entered August 28, 2020